## UNITED STATES v. LAUDANI.

### No. 7997.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 5, 1942.

Decided March 16, 1943.

Rehearing Denied April 20, 1943.

Harold Simandl, of Newark, N. J., for appellant.

Charles A. Stanziale, Asst. U. S. Atty., of Newark, N. J. (Charles M. Phillips, U. S. Atty., of Trenton, N. J., on the brief), for appellee.

Before BIGGS, MARIS, and JONES, Circuit Judges.

JONES, Circuit Judge.

Laudani, the appellant, and one Rossi, along with several others, were charged in each of a number of counts in fourteen separate indictments with having induced, by means of intimidation, threats of dismissal, etc., certain named employees of a company doing work, financed in part by grants from the United States, to give up to the defendants portions of the employees' weekly compensation in alleged violation of the Act of June 13, 1934, c. 482, Sec. 1, 48 Stat. 948, 40 U.S.C.A. § 276b, commonly known as the "Kick-Back Act". The court, on the government's motion, severed as to all defendants except Laudani and Rossi on five of the indictments, which were thereupon tried together. Rossi was acquitted. Laudani was convicted on one or more of the counts in each of the indictments tried except one as to which the government consented to a dismissal. Laudani appeals from the ensuing judgment of sentence.

The appellant contends that the evidence was insufficient to convict on any of the counts in the indictments, but we deem it unnecessary to treat with that contention, for in our opinion the facts alleged and proven by the government do not lay a case within the purview of the statute cited. This question was raised timely by the appellant's demurrers and motions to quash before plea; by his motion for directed verdict of acquittal at the close of the government's case as well as at the close of the entire case; and by his motion in arrest of judgment after verdict. All of these motions were overruled or denied.

It is therefore unnecessary to recite in detail the evidence with respect to each of

the specific counts whereon convictions were had. A statement of the basic facts common to all of the counts in all of the indictments will be sufficient for the consideration of the question which we deem crucial. (Incidentally, there was also at trial what we consider to be reversible error to which we shall make reference later because of its significance to trials in general.) Except for appropriate differences in names, dates and sums of money allegedly exacted from employees, all of the counts of the several indictments are couched in identical language and supply the following factual situation.

Between January 1, 1937, and May 15, 1938, there was under construction at Weehawken, New Jersey, certain public work known as the Weehawken Plaza under a general contract between the Port of New York Authority and George M. Brewster & Son, Inc., and a sub-contract between the Brewster company and the Cape Ann Granite Company for the furnishing and setting of granite rubble facing and coping necessary in the construction. The work was financed in part by grants from the United States. Laudani, the appellant, was foreman for the Cape Ann Granite Company and, as such, had authority to employ and discharge stone masons and other stone workers in connection with the work. He knew that the rate of pay for such employees, as fixed and posted on the work, was a certain amount per hour over the period of time involved in the indictments and that all workers so employed were entitled to receive compensation in full at the posted rate of pay without deduction for any purpose whatever. Notwithstanding, Laudani and one or more of his representatives, as the indictments alleged, induced by threats of dismissal, etc., certain named employees of the Cape Ann Granite Company to give to and for Laudani and one or more of his representatives parts of such employees' wages to which the latter were entitled for work and labor performed on the particular work.

Section 1 of the Act of June 13, 1934, 40 U.S.C.A. § 276b, whereon the indictments are based, provides that, "Whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

■■ From a reading of the statute it seems plain that the evil aimed at is the inducing of an employee, engaged in work of the character specified, "to give up any part of the compensation to which he is entitled under his contract of employment". The "contract of employment" referred to of course means the contract between the employee and his employer. United States v. Golder et al., D.C.E.D.Pa., 11 F.Supp. 870, 871. Essential, therefore, to the crime as defined by the statute is the impairment, violation or derogation of the employee's contractual right with respect to the wages he is to receive. As the person capable of so offending, because of the requisite privity of contract, is the employer, the statute as written necessarily has application to a situation where the employee gives up or cedes a portion of his contractual wage to or in favor of or at the instance of the employer or one acting for or on behalf of the employer. In the Golder case, supra, Judge Kirkpatrick of the District Court for the Eastern District of Pennsylvania, said that "If the workman receives the whole amount of the wages which the employer agreed to pay him when he went to work and is not compelled to give back or to waive any part of it, the act has not been violated." Further specifying in United States v. Charlick, D.C.E.D.Pa., 26 F.Supp. 203, 205, the same Judge stated, and we think correctly, that "The offense at which it [the "Kick-Back Act"] is aimed is, compelling workmen to return *to their employers* wages to which the contract between the employer and his employees entitles them." (Emphasis supplied.) The views thus expressed in the Golder and Charlick cases, supra, as to the aim and scope of the statute were quoted with approval by the Comptroller General in a decision (A-90983) rendered the Secretary of the Treasury on December 14, 1939. See 19 Comp.Gen. 576, 577, 578.

■ The conclusion that the offense denounced by the statute consists of inducing an employee to give up a portion of his wages in derogation of his *contract of employment* (necessarily to the enrichment of

the other party thereto) finds further confirmation in the expressed purpose of the statute. According to its title, it was designed "To effectuate the purpose of certain statutes concerning rates of pay for labor, by making it unlawful to prevent anyone from receiving the compensation contracted for thereunder, and for other purposes." · 40 U.S.C.A. §§ 276b, 276c. So long, therefore, as the employer pays his employees the wages to which they are entitled under their contracts of employment and the employees are not induced or required to give back any part of their compensation, it cannot be said that they have been prevented from receiving the compensation to which their contracts of employment entitle them. What happens to the compensation after the employee has received it in full, and wholly without relation to or effect upon his contract of employment, is a matter with which this statute does not purport to deal.

The legislative history of the Act leaves little doubt that it was intended to penalize contractors who, enjoying federal work or work federally aided, unconscionably enrich themselves at the expense of their employees in denial of their contracts of employment. In reporting favorably the bill (S. 3041), which eventuated in the Act, the Senate Committee on the Judiciary stated that hearings had "* * * revealed that large sums of money have been extracted from the pockets of American labor, to enrich contractors, subcontractors, and their officials." The report also quoted from "one of the great leaders of labor" to the effect that "It has been a common practice for contractors constructing Federal buildings to pay the employees the prevailing rate as determined by the Secretary of Labor and then have them return a certain amount to the contractor. * * *" Senate Report No. 803, 73rd Cong. 2d Sess. In the House, whose Committee on the Judiciary also reported the bill (S. 3041) favorably, the Committee report stated that "This bill is aimed at the suppression of the so-called 'kick-back racket' by which a contractor on a Government project pays his laborers wages at the rate the Government requires him to pay them, but thereafter forces them to give back to him a part of the wages they have received." House Report, No. 1750, 73rd Cong. 2d Sess.

Nor is it entirely without significance that Sec. 2 (48 Stat. 948), which was expressly included in the Act as an aid in the enforcement of Sec. 1 (the penal provision), authorizes the Secretary of the Treasury and the Secretary of the Interior jointly to make reasonable regulations "for contractors or subcontractors on any such building or work, * * *." Of course, no distinction is to be drawn, and we make none, between work for which the government directly lets a contract to which "the prevailing rate" of wage to the contractor's employees attaches by virtue of the Act of March 3, 1931, c. 411, § 1, 46 Stat.1494, as amended, 40 U.S.C.A. § 276a et seq., and federally aided work performed for other public agencies to which rates of pay to employees attach by virtue of competent federal departmental regulations. The "Kick-Back Act" is broad enough to embrace all work financed in whole or in part by federal funds. In fact, the bill (S. 3041) was purposely amended in such regard in Senate committee. See Senate Report, supra.

But nowhere in the Act, its title, or its legislative history is it suggested that it was intended thereby to reach an extortioner or blackmailer (not privy to the contract of employment) merely because the persons upon whom such an offender preys receive their compensation as employees of a contractor doing public work financed in whole or in part by federal aid. Nor would a court be justified in so extending the statute. Being penal, it is to be strictly construed and not extended by judicial construction beyond what the legislature has written. United States v. Resnick 299 U.S. 207, 209, 57 S.Ct. 126, 81 L.Ed. 127. The sanctions of the "Kick-Back Act" are directed at offending employers amenable to federal regulations. Equally reprehensible though it is for one not the employer to exact tribute from a workman upon threat of disturbing him in his employment, no greater need for federal protection of workers against the threats of extortioners or blackmailers in general is indicated simply because their employer happens to derive all or a part of his income from work dependent upon federal loans or grants. All other workers merit no less consideration. But extortion or blackmail visited upon private persons in respect of their private rights or prop-

erty are offenses which, under our federal system, have been left to the criminal administration of the states.[1] A proper regard for that tradition requires that a federal criminal statute be not construed so as to duplicate state offenses unless Congress has plainly exhibited an intention so to do. Such should be the approach in construing a federal statute, particularly because of the historic role of the states in ordinary matters of criminal administration and because the same personal conduct can be made both a state and a federal offense without violating the double jeopardy clause of the Constitution. Jerome v. United States, 63 S.Ct. 483, 87 L.Ed. ——, decided February 1, 1943. Under the construction of the statute, here involved, which the government necessarily urges in an effort to sustain the indictments, the blackmailer, who, wholly unconnected with his victim's employment, requires and receives a part of the employee's wages each week for withholding knowledge of something which the latter desires to keep secret from his employer lest he lose his job, would be equally indictable. Clearly, the statute was not so intended. Furthermore, any such extension of its scope suggests the possible invasion of the field of private rights and wrongs, unrelated to any federal interest or concern, which Congress is without constitutional warrant to enter upon. "The regulation of the conduct of its own citizens belongs to the state, not to the United States." United States v. Constantine, 296 U.S. 287, 296, 56 S.Ct. 223, 227, 80 L.Ed. 233.

■ None of the indictments in this case alleges that the employer did not pay its employees the wages to which they were entitled under their contracts of employment, or that the employees were prevented from receiving their wages in full, or that Laudani's exactions from employees were made for or at the instance of the employer. Nor were these omissions of material allegation mere oversights. The indictments specifically allege that the sums exacted from the employees were paid *to* or* *for Laudani.* And the government proved at trial that the employer had paid its employees their wages in full in accordance with their contracts of employment, knew nothing of any exactions by Laudani or anyone else, and disapproved of such conduct on the part of anyone. Consequently, it is our opinion that the indictments were fatally defective in that they failed to allege an offense under the statute. The motions to quash should therefore have been sustained. So much disposes of the present appeal, but we deem it appropriate to advert to certain trial error in the hope that a like occurrence may be avoided in the future.

■ The defendant, testifying in his own behalf, denied that he had ever exacted any portion of the wages of any of the employees of the Cape Ann Granite Company. Only a relatively small number of that company's approximately one hundred employees had testified to opposite effect. The United States attorney argued to the jury that the defendant should have produced as witnesses the

[1] It could serve no useful purpose to enter upon a discussion as to whether the conduct alleged in the indictments amounted to extortion or blackmail. It is sufficient that, unless a need to protect some federal interest is present or inherently involved, conduct such as that described in the indictments is ordinarily left for condemnation by the states. At common law, extortion is the taking, by color of office, of money or other thing of value that is not due, before it is due, or more than is due. See Annotation 4 L.R.A. p. 360; 2 Wharton, Criminal Law (Twelfth Ed.) § 1904. The offense required an official as the perpetrator. In some of the states, however, the scope of the offense has been enlarged so as to include any obtaining of property of another with his consent through a wrongful use of force or fear under circumstances not amounting to robbery. In some jurisdictions the crime of blackmail is punished by statute and the crime is said to be indistinguishable from that of extortion. 22 Am.Jr., Extortion and Blackmail, § 2, pp. 234–235. In such instances where the common law definition of extortion has been enlarged by statute to include what is ordinarily termed "blackmail" the offense may be committed by a private individual. Am. Jr., cit. supra, § 18, p. 238. It has been said that "The statutes of California probably illustrate the nature of the statutes in other states upon the subject of threats insofar as they constitute the crime of extortion." See Annotation 116 Am.St.Rep. 446, 450. Section 518 of the California Penal Code provides: "Extortion is the obtaining of property from another, with his consent, * * * induced by a wrongful use of force or fear, or under color of official right."

many employees whom he was not charged by the indictments with having induced to give up to him a portion of their wages, in order that they might testify that he had never exacted anything from them. The implication of the argument was unmistakable that the defendant's failure to call such witnesses furnished an inference that, had he called them, they would have testified adversely to him. This of course was improper. The permissible inference deducible from one's failure to produce evidence arises only when the evidence, if produced, would have been competent and admissible as relevant and material to the issues. Hall v. United States, 4 Cir., 256 F. 748, 750, 751; Hamburg-American Steam Packet Co. v. United States, 2 Cir., 250 F. 747, 768. Not possibly could the defendant have refuted the employees who testified against him by calling other employees who were not qualified to testify respecting the matters actually in issue. In a quite similar situation in the Hall case, supra, the Court of Appeals for the Fourth Circuit characterized the district attorney's argument in such regard as "manifestly improper" and said that it imposed a burden upon the defendant not imposed upon him by law.

 In the instant case counsel for the defendant promptly and appropriately objected to the argument for the government and moved that the objectionable remarks of the district attorney be stricken from the record and that the jury be instructed to disregard them. This, the trial judge refused to do, saying, "I could not tell the jury that, because I don't think that would be quite accurate. Will you excuse me from making any further comments, if you don't mind? I will overrule your motion and give you an exception." What the Supreme Court said in Hall v. United States, 150 U.S. 76, 81, 82, 14 S. Ct. 22, 24, 37 L.Ed. 1003, where the trial judge failed to act timely and directly upon due objection of defendant's counsel to the district attorney's argument, is quite apposite here, viz., "The presiding judge, by declining to interpose, notwithstanding the defendant's protest against this course of argument, gave the jury to understand that they might properly and lawfully be influenced by it; and thereby committed a grave error, manifestly tending to prejudice the defendant with the jury, and which, therefore, was a proper subject of exception, and, having been duly excepted to, entitles him to a new trial."

Here, likewise, the failure of the trial judge to rule upon the pertinent objection of defendant's counsel, of itself, served to aggravate further the error of the district attorney's improper argument; and a new trial would now be a necessary consequence, had the insufficiency of the indictments not intervened to put an end to the prosecution.

The judgment is reversed and the cause remanded with directions to the District Court to quash the indictments.

BIGGS, Circuit Judge (dissenting in part).

I concur in the view expressed by the majority that the court below erred in permitting the prosecuting attorney to argue, over the objections of the defendant's counsel, that it was incumbent upon the defendant to produce as witnesses on his behalf the many employees of the Cape Ann Granite Company whom he was not charged by the indictment with having subjected to extortion so that they could testify that he had not exacted anything from them.

On the other hand I must dissent from the ruling to the effect that Section 1 of the Act of June 13, 1934, c. 482, Sec. 1, 48 Stat. 948, 40 U.S.C.A. § 276b, the "Kick-Back Act", is not sufficiently broad to cover the acts of the defendant. I agree with the majority that the "contract of employment" referred to in the statute is the contract of employment between the employer and the employee and that the crime prohibited by the statute is the impairment or derogation of the employee's contractual right to the wages he is bound to receive under the contract. But to hold that the only person who is capable of offending against the statute is an employer, because only an employer is in privity of contract with the employee, is to emasculate needlessly an important criminal statute.

The defendant was a foreman employed by Cape Ann Granite Company. That company put him in charge of the stone masons employed by it. The defendant possessed the power to employ them or to discharge them and his connection with them was more direct and hence more influential than that of many a higher official of the Cape Ann Granite Company. The defendant was in privity to the contract by representation, his representation being that of his employer.

The language of the section is very broad and is ambiguous. It does not make use of the word "employer", though there is direct reference to the contract of employment and to the "person employed". The section uses the word "Whoever" to name the person who may offend against the prohibition of the statute. "Whoever" means "Whatever person; any person soever."[1] From the very terms of the statute it is obvious as the majority cogently point out that the section was not intended to apply to instances of extortion unconnected with the contract of employment.[2] But the limitation imposed by the majority is too strict as the legislative history of the section demonstrates.

The bill (S. 3041) was the subject of a Senate Report, No. 803, 73rd Cong., 2nd Sess. Senator Stephens from the Committee on the Judiciary stated in part, "Hearings of the Senate Committee on Racketeering revealed that large sums of money have been extracted from the pockets of American labor, to enrich contractors, subcontractors, and their officials." Certainly if the president or a director of a corporation caused an employee to kick back a part of his wages under threat of dismissal the acts of such an "official" would be within the prohibition of the section. In my opinion a foreman is an official of a company. The defendant was not a stranger in fact or in law to the contract of employment. I think that his conduct falls within the prohibition of the statute.

While I agree with the majority that a criminal statute must be construed strictly, the construction should not be so strict as to deny the fair intendment of Congress. I conclude therefore that the acts which Laudani did were a violation of the statute. In arriving at this conclusion I am not unmindful of the decisions of Judge Kirkpatrick of the United States District Court for the Eastern District of Pennsylvania in United States v. Golder, 11 F.Supp. 870, 871, and in United States v. Charlick, 26 F.Supp. 203, 205. The words of that careful jurist are entitled to great weight but what he said in the cited cases was not apposite the question sub judice.

It follows therefore that while I concur in the view of the majority that the judgment of the court below should be reversed, I am of the opinion that a new trial should be ordered and that the direction of the majority that the indictment be quashed is in error.

---

[1] Webster's New International Dictionary. The Universal Dictionary of the English Language defines the word as "Who, the person, any person, anybody, be he who he may." Funk & Wagnalls Concise Standard Dictionary defines "Whoever" as, "Any one without exception who."

[2] I wish to make plain as do the majority that the responsible officials of Cape Ann Granite Company were not aware of the course of conduct of Laudani, were not parties to it, and did not countenance it.