[No. 29068. Department One. July 26, 1943.]

THE STATE OF WASHINGTON, *Respondent*, v. CARROLL CARTER, *Appellant*.[1]

[1] Reported in 140 P. (2d) 298; 142 P. (2d) 403.

*Henry Clay Agnew,* for appellant.

*Lloyd Shorett* and *John J. Kennett,* for respondent.

MALLERY, J.—Carroll Carter was convicted on all eight counts of an information, filed in King county, charging him with the crime of collecting or receiving a rebate of employees' wages, from which conviction he appeals. The charging parts of all eight counts are the same, excepting only as to the names of employees and amounts. Therefore, it will suffice, for the purposes of this opinion, to set out the charging language of count one, which is:

"He, the said Carroll Carter, being the elected, acting, and qualified county treasurer of King county, Washington, in the county of King, state of Washington, on or about the first day of February, 1943, did collect or receive the sum of Twenty-one dollars ($21.00) from William R. Randolf, an employee in the office of the county treasurer, King county, Washington, the said Twenty-one dollars ($21.00) being a re-

bate of a part of the wages theretofore paid by King county to said William R. Randolf."

To this information, appellant interposed a demurrer. At the close of the state's case, appellant challenged the sufficiency of the evidence, which challenge was denied, and appellant assigns the denial as error.

The pertinent part of Rem. Rev. Stat. (Sup.), § 7612-21 [P. C. § 3552-31] (amended in other particulars and now appearing as Rem. Supp. 1941, § 7612-21), under which the information was brought, reads as follows:

"Any employer or officer, vice-principal or agent of any employer, whether said employer be in private business or an elected public official, who

"(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; . . .

"Shall be guilty of a misdemeanor."

Assuming, but not deciding, that all of the state's evidence was competent and that it will sustain the allegations of the information, does it establish that the appellant committed the crime of collecting or receiving a rebate of employees' wages, as defined by the statute? Each count of the information alleges that the *appellant* did collect or receive a certain sum from an employee in the office of the county treasurer theretofore *paid by King county*.

In the case of *Savage-Scofield Co. v. Tacoma,* 56 Wash. 457, 105 Pac. 1032, this court said: "Accepting the common use of the word 'rebate—to draw back,' one cannot draw back something which he never put forward, . . ."

In the case of the *United States v. Laudani,* 134 F. (2d) 847, the court said:

"*Laudani,* the appellant, was *foreman for the Cape Ann Granite Company* and, as such, *had authority to employ* and discharge stone masons and other stone workers in connection with the work. He knew that the rate of pay for such employees, as fixed and posted

on the work, was a certain amount per hour over the period of time involved in the indictments and that all workers so employed were entitled to receive compensation in full at the posted rate of pay without deduction for any purpose whatever. Notwithstanding, Laudani and one or more of his representatives, as the indictments alleged, induced by threats of dismissal, etc., certain named employees of the Cape Ann Granite Company to give to and for Laudani and one or more of his representatives parts of such employees' wages to which the latter were entitled for work and labor performed on the particular work.

"Section 1 of the Act of June 13, 1934, 40 U. S. C. A. § 276b, whereon the indictments are based, provides that, 'Whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both.'

"From a reading of the statute it seems plain that the evil aimed at is the inducing of an employee, engaged in work of the character specified, 'to give up any part of the compensation to which he is entitled under his contract of employment.' The 'contract of employment' referred to of course means the contract between the employee and his employer. *United States v. Golder et al.*, D. C. E. D. Pa., 11 F. Supp. 870, 871. Essential, therefore, to the crime as defined by the statute is the impairment, violation or derogation of the employee's contractual right with respect to the wages he is to receive. As the person capable of so offending, because of the requisite privity of contract, is the employer, the statute as written necessarily has application to a situation where the employee gives up or cedes a portion of his contractual wage to or in favor of or at the instance of the employer or one acting for or on behalf of the employer. In the *Golder* case, *supra,* Judge Kirkpatrick of the District Court for the Eastern District of Pennsylvania, said that 'If the

workman receives the whole amount of the wages which the employer agreed to pay him when he went to work and is not compelled to give back or to waive any part of it, the act has not been violated.' Further specifying in *United States v. Charlick,* D. C. E. D. Pa., 26 F. Supp. 203, 205, the same Judge stated, and we think correctly, that 'The offense at which it [The "Kick-Back Act"] is aimed is, compelling workmen to return *to their employers* wages to which the contract between the employer and his employees entitles them.' " (Italics ours.)

In the light of the above quoted cases, we are constrained to hold that money paid by King county and collected or received by the appellant, as an individual, is not a rebate under the purview of the statute.

To hold that money so paid and collected or received is a rebate, as we understand the term, would be to affirm, in effect, one or the other of the following propositions: (1) that the appellant, and not King county, is the employer and that the wages were paid from the funds of the appellant rather than of King county; or (2) that the money was collected or received by King county, as such, as a rebate, rather than by the appellant individually. Neither of these propositions is sound, in our opinion.

The information, therefore, does not allege the commission of an offense as defined by the statute.

The judgment is reversed, and the trial court is directed to dismiss the information.

MILLARD, J., concurs.

STEINERT, J., concurs in the result.

JEFFERS, J. (concurring in the result)—I am unable to agree with the majority opinion; however, I have reached the same result, but on an entirely different ground.

I am of the opinion that the information filed in this case charges a crime, under Rem. Rev. Stat. (Sup.), § 7612-21 [P. C. § 3552-31], subsection (1). The in-

formation contains eight counts, which are identical except as to the value of the money alleged to have been collected or received, and the names of the employees. The charging part of count one is as follows:

"He, the said Carroll Carter, being the elected, acting, and qualified county treasurer of King county, Washington, in the county of King, state of Washington, on or about the first day of February, 1943, did collect or receive the sum of Twenty-one dollars ($21.00) from William R. Randolf, an employee in the office of the county treasurer, King county, Washington, the said Twenty-one dollars ($21.00) being a rebate of a part of the wages theretofore paid by King county to said William R. Randolf."

The cause came on for trial before the court and jury on March 25, 1943, and thereafter the jury returned a verdict of guilty on all eight counts. Motions for new trial and in arrest of judgment were timely filed and denied. On April 20, 1943, the court entered judgment on the verdict, and assessed a fine of fifty dollars against defendant on each count. Defendant has appealed from the judgment entered.

The majority opinion cites the case of *Savage-Scofield Co. v. Tacoma,* 56 Wash. 457, 105 Pac. 1032, and the case of *United States v. Laudani,* 134 F. (2d) 847, to sustain the conclusion therein reached that the information does not allege the commission of an offense as defined by § 7612-21, *supra.* This section, in so far as material, provides:

"Any employer or officer, vice-principal or agent of any employer, whether said employer be in private business or an elected public official, who

"(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; . . .

"Shall be guilty of a misdemeanor."

I am of the opinion the statute shows a plain intent to cover an elected public official, regardless of the fact that the money from which the salaries of the

employees in such office are paid does not come out of the pockets of such official.

Where there are two constructions which can be placed upon a statute, one of which will render it effective and the other ineffective, it is the duty of the court to adopt the construction which will render the statute effective. The foregoing rule is so universally accepted as to need no citation of authority to sustain it.

It must be admitted that the legislature, at the time of the enactment of § 7612-21, *supra,* was well aware of the fact that the money used to pay the salaries of the employees in Mr. Carter's office came from county funds, and not from Mr. Carter. It must also be admitted that the legislature was familiar with Rem. Rev. Stat., § 4108 [P. C. § 1822], which provides:

"County treasurers may appoint one or more deputies, and may take from them bond, with sureties; they shall have power to remove their deputies at pleasure, and every county treasurer and his sureties shall be liable for all official acts of his deputies."

It is apparent from the statute last above quoted that a county treasurer has all the powers and liabilities of an ordinary employer, in so far as the deputies or employees of his office are concerned, except that the salaries of such employees are paid from county funds.

It seems to me plain that it was the intent of the legislature, by § 7612-21, *supra,* to classify a county treasurer as an employer, in so far as the employees of his office are concerned, although he be in fact only an officer of the county, and to make such public officer liable for a violation of the statute, even though, as stated, the money from which the wages of the employees of his office are paid comes from county funds. If it was not the intent of the legislature to give to this statute the construction which I have given it, then it would be entirely ineffective, in so far as elected public officials are concerned. I am not willing to concede that the legislature did a useless thing.

It does not seem to me that the conclusion I have reached calls for any strained or unreasonable construction of the statute; neither does it call for other than the ordinary definition of the word "rebate," when we consider that, in so far as this section is concerned, the legislature intended to class such an elected public official as an employer.

I now desire to discuss the two cases referred to in the majority opinion, and also relied upon by appellant to sustain his contention that appellant, under the section stated, could not be convicted of soliciting or receiving a rebate.

The case of *Savage-Scofield Co. v. Tacoma,* 56 Wash. .457, 105 Pac. 1032, is cited and relied upon because of the definition of the word "rebate," found therein. The cited case involved the construction of an ordinance of the city of Tacoma, and was decided in 1909. The ordinance dealt with city streets which should be paved, after the granting of a certain franchise to one E. J. Felt for street railway purposes, and in so far as material provided:

"That hereafter when any street covered by this franchise shall have been paved before the laying of tracks under this franchise, before commencing any work on such streets, for the laying of tracks, the said grantee, his successors or assigns, shall pay into the city treasury the cost of the pavement on the part of said streets which is covered by the franchise between the tracks, between the rails, and for two feet outside of the outside rails of the track or tracks; and said sum so to be paid shall be determined by *pro-rating* the cost of said portion of said street in proportion to the original cost of the entire pavement on such street, and said sum shall be paid to the city treasurer and by the city treasurer and controller rebated to the owners of the property where the special assessment against the property affected thereby shall have been paid." Ordinance of Tacoma, No. 2,768.

A special improvement district was formed for the purpose of paving south Seventh street. One William

Jones and wife had been the owners of certain lots in this improvement district, and these lots were assessed for their proportionate share of the paving. Jones and wife sold the lots to Savage-Scofield Company. As provided in the ordinance, the "traction company," as assignee of Felt, thereafter paid to the city its proportionate part of the cost of the paving, amounting to $190.80. Demand for that amount was made upon the city by Savage-Scofield Company, as owner of the lots obtained from Jones. The demand was refused, and this action was brought. A demurrer to the amended complaint was sustained, upon the ground that it did not state facts sufficient to constitute a cause of action. The plaintiff electing to stand upon its complaint, the action was dismissed. The opinion states that the assessment levied against the lots now owned by the plaintiff was paid out of Jones' money, and not out of money belonging to the plaintiff. I quote from the opinion:

"But it is contended by the appellant that the court erred in its construction of the ordinance above quoted, which is the material question in this case. Many authorities are cited to support principles which cannot be questioned, viz: That the intent of the ordinance controls its construction; that it is presumed that words and phrases used in an ordinance or statute are used therein in their familiar and popular sense; and that in construing statutes the particular inquiry is, *not what is the abstract force of words or terms used or what they may comprehend,* but in what sense they were intended to be used, etc. But admitting the principles announced, it seems to us that they are not controlling in this case, for a strict construction of this ordinance, which is contended for by the appellant, would do violence to its evident meaning and would result in injustice. The evident object of the ordinance was to make restitution. This means, to restore. The money could only be restored to the person to whom it properly belonged and who had once had possession of it. The appellant says that the latest dictionaries of the English language define the word 'rebate' to mean,

'to draw back'; 'to discount'; 'to make a reduction from a gross or normal amount or sum.'

"Accepting the common use of the word 'rebate'—'to draw back,' one cannot draw back something which he never put forward, and it would be doing more violence to the plain meaning of words to hold that the word rebate *as used in this ordinance* has reference to a stranger who had never given or put forth the amount in question, than it would be to hold that the word 'owner' as used in the ordinance had reference to the person who was owner at the time that the money was paid into the treasury instead of the person who happened to be owner at the time when the rebate was due. *In passing the ordinance, the council was evidently considering the ordinary case where the owner at the time the assessment was paid would be the owner at the time of the payment into the treasury by the contractor."* (Italics mine.)

The opinion held that the plaintiff, Savage-Scofield Company, had no interest in the rebate, as it was not the owner at the time the assessment was paid.

I do not think the cited case requires that there be placed upon the statute relied upon in the instant case a construction different from that given to it by the trial court and in accordance with the construction I have given it. It seems to me the cited case supports the conclusion reached herein, in that it supports the rule that the intent of the statute controls its construction, and the further rule that it is not what is the abstract force of words or terms used, or what they may comprehend, but in what sense they were intended to be used in the particular statute under consideration.

Accepting the common definition of the word "rebate," as given in the case last cited, I am satisfied it is the plain intent of § 7612-21 to make an elective public official guilty of the crime of collecting or receiving from any of the employees of his office a rebate of any part of the wages paid to such employees, even though, as stated, such official does not in fact pay such wages from his own money.

I now desire to discuss the case of *United States v.*

*Laudani,* 134 F. (2d) 847, from which the majority quotes, and which appellant states in his brief is the only case in which an act such as here under consideration has been construed. In the cited case, the foreman of a corporation was prosecuted under § 1 of the act of June 13, 1934, 40 U. S. C. A. (Sup.), § 276b, which provides:

"Whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

It will be noticed that the statute under consideration in the cited case is materially different from the one concerned in the instant case. The reason for holding that such foreman, who admittedly had the power to hire and fire, and who used this power to *force* the employees of the corporation to give him, personally, a portion of their wages every pay day, was not guilty of violating the statute, is based upon the intent of the statute and the evil aimed at therein. I quote from the opinion:

"From a reading of the statute it seems plain that the evil aimed at is the inducing of an employee, engaged in work of the character specified, 'to give up any part of the compensation to which he is entitled under his contract of employment.' The 'contract of employment' referred to of course means the contract between the employee and his employer. *United States v. Golder et al.,* D. C. E. D. Pa., 11 F. Supp. 870, 871. Essential, therefore, to the crime as defined by the statute is the impairment, violation or derogation of the employee's contractual right with respect to the wages he is to receive. As the person capable of so offending, because of the requisite privity of contract, is the employer, the statute as written necessarily has applica-

tion to a situation where the employee gives up or cedes a portion of his contractual wage to or in favor of or at the instance of the employer or one acting for or on behalf of the employer."

It was proven at the trial that the employer (corporation) had paid its employees their wages in full, in accordance with their contracts of employment, knew nothing of any exactions by the foreman or anyone else, and disapproved of such conduct on the part of anyone. The court held that the motion to quash the indictment should have been sustained.

I assume that it is the contention of appellant that the foreman in the cited case is in a comparable situation to an elected public official, under the statute here under consideration, but I cannot so conclude. In the statute here under consideration, it was the plain intent of the legislature to guard against the evil of an elective public official collecting or receiving from any of the employees of his office a rebate of any of the wages of such employee. This and other distinctions which might be made make the cited case inapplicable here.

While, as stated, I am unable to agree with the majority opinion, I am of the opinion that the challenge to the sufficiency of the evidence made by appellant at the close of the state's case should have been granted, and the cause dismissed.

Appellant bases error on the refusal of the trial court to sustain his challenge to the sufficiency of the evidence. This necessitates a consideration of the testimony.

As stated, the information contains eight counts, all eight of the men who made contributions for the purpose of liquidating some of Mr. Carter's debts testifying as the state's witnesses. We shall refer to their testimony later. Mr. Kline, who collected all the money paid by Mr. Carter's employees, and who, under the uncontradicted testimony, was the originator of the

idea to devise some means of assisting Carter to liquidate his debts, also was called by the state.

In order to get the setting for what followed, it will be necessary to go back to the time after Carter was elected but before he took office. It appears that Kline, who had worked in the office for Mr. Stacy, was perturbed as to whether or not Mr. Carter, when he took office, would require any "kick-back" from the employees in his office. He apparently expressed his concern to Mr. Stacy, and was told to ask Carter to state what his attitude was going to be. Apparently Mr. Carter stated there would be nothing of that kind in his office. After Mr. Carter took office in January, 1943, Mr. Kline was retained and made chief clerk, and as such received a higher salary than he had formerly received.

Sometime before January 30, 1943, Kline learned, from what source does not appear, that Carter was indebted about thirty-five hundred dollars, and he conceived the idea that it would be a fine gesture if the employees could make up a fund to liquidate this indebtedness. It does not appear that he had in mind just how this could be done, or that it could be done at all. In order, therefore, to get an expression from the employees, he posted on the bulletin board in the treasurer's office a notice that a meeting would be held at noon, on January 30th, and requested the employees to be present. It does not appear that Carter knew of this meeting, or that he was consulted in any way in regard to it, or that he authorized Kline to call it, but it was called by Kline on his own initiative. Carter was not present at the meeting. It does not appear that the employees knew the purpose of the meeting, but they appeared and Mr. Kline presided.

I now desire to refer to the testimony of Mr. Randolf, a witness called by the state, and who is the man who made the contribution upon which count one is based. This witness testified that he attended the

meeting of January 30th; that the first knowledge he had of the meeting was when he saw the notice on the bulletin board that morning. The witness stated that at this meeting nothing was said about where the donations were to come from, but that he thought it was suggested by someone that the amount to be raised be prorated on the amount of the salary each person in the office received. He further stated that Mr. Kline said he did not want Mr. Carter to know about what they were doing.

Mr. Powell, whose contribution was the basis for count two, testified that the purpose for which the money was to be raised was to underwrite "this debt of Mr. Carter's"; that Mr. Carter never asked him to give anything from his wages. The witness was asked:

"Q. Were you at the first meeting of the employees when Carter addressed it, back when he first took office about January 11th? A. Yes. Q. Did he not say then that he would have no contributions, in response to a question? A. Yes."

The witness testified that nothing was said to the effect that the amounts to be contributed were to come from wages, but that the amount each was to pay would be computed on a basis of ten per cent of the monthly salary.

Mr. White, whose contribution was the basis for count three, testified that he had not discussed with Mr. Carter, Mr. Kline, or Mr. Geisert, the matter of making any contribution, prior to the meeting of January 30th, and that the first he knew of such a meeting was when he saw the notice on the bulletin board. This witness was asked the following question:

"Q. Will you tell us what Mr. Kline stated at that meeting? A. Well, he said that they called the meeting together here of the employees to see if we can't underwrite the campaign expense of the county treasurer by Mr. Carroll Carter, and wanted to know what we thought of it. There was no dissenting voice of any type, and there was some clapping and kind of a rumble of voices is all."

He further testified that, on Monday following the Saturday meeting, he asked Mr. Kline what his share would be, and that Kline told him, the witness stating he would pay it the next day, which he did.

At this point, we desire to refer again to the testimony of Mr. Kline:

"Q. Who determined the amount each employee was to pay? A. That was determined by the suggestion of three or four of the employees in the office. Q. When was the suggestion made? A. On the day right when we was holding the meeting. Q. All right. Who were the three or four that suggested it? A. Well, one of them was Mr. Roy Thayer. . . . Q. Mr. Thayer is the only one you can remember? A. I think Mr. Thayer is the man that first suggested it. Q. What was his suggestion? A. That it be prorated on the amount of the salaries that each employee got. . . . Q. Who actually determined the percentage that would have to be applied to each individual's wages? That is, to raise the amount of money you sought? A. I did. Q. And when did you do that? A. Well, probably on Saturday afternoon after the meeting. Q. Well, is that when it was? A. Well, it was Saturday afternoon after the meeting."

It was determined that in order to raise the thirty-five hundred dollars, the contribution of each employee would be based upon ten per cent of his salary for three months.

Mr. Matthews was called to prove the allegations of count four. He testified that he attended the meeting of January 30th, and, in answer to a question as to what transpired at the meeting, answered:

"Well, Mr. Kline called the meeting for the purpose of putting up the proposition to the force about underwriting Mr. Carter's indebtedness, which he indicated was about $3500.00, and thought it would be a very nice thing for the staff to get together and work out some payment plan. And no one made any objection to the idea, so it was apparently considered O. K. And someone suggested that it ought to be done on a pro rata basis."

This witness further stated that Mr. Kline did not make any statement as to how Mr. Carter's indebtedness had been incurred; that Mr. Kline asked them to say nothing about the matter, as the whole proposition was without Carter's knowledge, and he wanted to surprise Mr. Carter by paying the bills.

Mr. Pasquale testified in regard to count five. This witness, like the others, was asked on direct examination whether or not Mr. Kline gave as a reason why they should underwrite these debts that Mr. Carter had gone in the hole securing their jobs for them, to which Mr. Pasquale answered: "No, I don't think so." The witness was then asked what reason Kline did give why they should pay Mr. Carter's debts, and he answered:

"Well, he did not say much. He said since we are employed by Mr. Carter right now, and he has been very—very nice to all of us, so it would be very—it would be good if we could underwrite his debts and give him a surprise when we have paid all of his debts."

This witness also testified he did not understand Mr. Kline to say that Carter's debts were debts contracted in the last campaign.

Mr. Mendenhall was called, and testified in regard to count six. This witness testified that he made a contribution of twenty dollars, which he gave to Mr. Kline about February 1st. When asked how the amount was arrived at, he answered: "By a committee who prorated the amounts according to the salaries." He stated that he was told by Mr. Kline on Monday, February 1st, what his share would be. This witness testified that Mr. Kline took the floor at the meeting of January 30th and stated:

"That Mr. Carter had assured us that we were to continue as employees, and had also made arrangements for an increase in our salaries. This, he said, was a very fine matter on Mr. Carter's part, and he felt that as a matter of appreciation it would be a splendid gesture for us to underwrite an amount, about $3,500, of

a debt which Mr. Carter was laboring under, and which in a measure depreciated his ability in his official position."

This witness was not sure whether or not anything was said about these debts having been incurred in the previous campaign. He also testified that the matter of prorating was suggested by Roy Thayer, and that he (Mendenhall) said, "Sure, that is the only fair way." His testimony continued: "Prorate according to the salary? A. Yes, sir." On cross-examination, the witness was asked, among others, the following questions and gave the following answers:

"Q. I will ask you if it was stated there that this was a secret from Mr. Carter, and was to be kept that way until after the bills had been paid, and that he was to know nothing about it until the receipts were given him? A. That was the absolute understanding. Q. Did Carter ever ask you for any portion of your wages? A. He did not. Q. Counsel, the way he worded the question to you, as I have it here, asked you this question: 'How much was it determined that you would have to pay?' And you answered some amount. Did you feel that you had to pay anything? A. No, it was an agreement in the meeting. There wasn't a dissenting vote to the proposition at the meeting, so, therefore, it seems to me unanimous. Q. Did anyone express any unwillingness to the idea? A. Everybody seemed to be willing, yes."

On redirect examination, the witness was asked the following question by counsel for the state:

"Q. You reach that conclusion from the fact that no one spoke up and opposed it, I assume? A. Yes, they were given an opportunity for discussion."

Mr. Hoover testified relative to count eight. He was asked what transpired at the January 30th meeting, and answered as follows:

"A. The meeting was called by Mr. Kline, and I will say that he informed us in the initial remarks that the matter he wanted to suggest to us was a matter that he left entirely to us, and that it was not obligatory on

our part, and that it was simply our matter, and we decided what we wanted to do in regard to it, the raising of a certain amount of that indebtedness. . . . Q. Was there anything said about why you should make this contribution? A. There was not. Q. Were there any reasons assigned for your making it from your wages? A. It was a matter that was left optional with the employees."

This witness was asked: "Was there any statement made to the effect that Mr. Carter had gone in debt in helping you to secure your jobs?" to which question this witness, like the others answered "No." He was then asked the following question:

"Q. Did Mr. Carter, as far as you know, know anything about this meeting? A. No, because it was particularly stated by Mr. Kline in that initial meeting that Mr. Carter did not know anything about that meeting, the nature of it, what it was called for, or anything of the kind. In fact, we did not know—I did not know when I went to that meeting what it was for."

Mr. Geisert made the contribution upon which count seven was based. This witness had helped Mr. Carter in his recent campaign for county treasurer. The bills incurred by Mr. Carter in this campaign were paid by Mr. Geisert, and he collected some of the money. He testified that the bills for the campaign for county treasurer were all paid. This witness testified that Mr. Kline came to him on January 29th, and said to him: "Mr. Geisert, how much does Mr. Carter owe on political bills?" The witness then testified:

"And I said, 'I don't know what those old political bills are. I had nothing to do with them.' 'Well,' he said, 'will you find out for me?' And I said, 'Well, what do you want to know for?' He said, 'I am going to call a meeting and find out.' And then I proceeded to Mr. Barto and found out the amount of money that was owing, and I think it was around $3500.00. Q. And you gave that information then to Mr. Kline? A. I gave that information to Mr. Kline."

This witness had nothing to do with the collection of

the money from the employees, but Mr. Kline turned over to him the money he had collected. The witness was asked the following question:

"Q. And can you tell us why it was Mr. Kline turned it over to you instead of to Mr. Carter? A. Well, Mr. Kline said, 'You probably can find out easier than I can who Mr. Carter owes the money to, and you are more or less the outside man, and you can go and pay those bills and bring the receipted bills back to me.'"

On either February 1st or 2nd, Mr. Kline turned over to Mr. Geisert about twelve hundred dollars. Mr. Geisert further testified that on February 5th or 6th, he paid a Gateway printing bill of $216, and a bill of the Carl Art Advertising Company of sixty dollars, from the money received from Mr. Kline. Mr. Geisert paid to Mr. Kline his proportionate share of the money raised to pay the Carter debts. No money collected by Mr. Kline since February 23, 1943, has been turned over to Mr. Geisert.

Mr. Geisert testified that he put the money he received from Kline in a box in the treasurer's vault, and that is where the money has remained; that Mr. Carter had no key to this box, had never asked him for access to the box, and had never told him what to do with the money; that he did not ask Carter about paying the bills, and Carter did not know the bills had been paid until after Geisert had paid them. Mr. Geisert took his orders from Mr. Kline, relative to this matter. The witness was asked the following question:

"Q. By the way, this money you contributed was your whole contribution, was it? A. That is right. Q. Did you do it voluntarily? A. I did. Q. Did you feel under any compulsion about the matter? A. No. . . . Q. You have the money intact there in your office, locked up; is that right? A. I have."

All of the witnesses whose contributions were the basis for the several counts of the information had received an increase in their salaries after Mr. Carter took office. Some of these men were informed of the

raise by Mr. Kline, and some of them did not know of it until they received their first salary check.

Mr. Shorett, prosecuting attorney for King county, testified that he heard about these contributions, and after he had sent Mr. Mifflin, his deputy, to see Mr. Carter, and had received Mr. Mifflin's report, he called on Mr. Carter and talked to him. Mr. Shorett stated that during this conversation Mr. Carter told him that Mr. Kline had called a meeting of the employees without his knowledge, and the employees had agreed to raise thirty-five or thirty-six hundred dollars to pay off his indebtedness; that Mr. Kline was then called in, and he stated that Mr. Carter knew nothing of the meeting when it was called; that Mr. Kline further stated that the debts had been figured up and that it was agreed at the meeting that he (Kline) should compute the amount to be paid by each employee, and inform the employees at a later time as to what each share was, and that within a day or two he (Kline) informed the employees. This statement was made in Mr. Carter's presence. Mr. Shorett testified that he asked Mr. Carter where the money was, and the latter said it was in the safe. Mr. Shorett's testimony continues:

"I asked him if he had used any of it yet, and he said, no. Then I said, 'Well, as long as you have not used any of it, and you say the meeting was held without your knowledge, if you will give the money back to the employees we will just forget about the whole affair.' He told me then that this was not a rebate and this was not a violation of law. And I said it was up to me to determine what the law was, and in my judgment it was a violation of law, and that if he would give it back again there would be nothing done about it, but that if it was not given back, I would have no choice in the matter. I would have to file charges against him."

The money was not returned to the employees, and,

subsequent to the above conversation with Mr. Carter, the information was filed.

It further appears from Mr. Kline's testimony that on February 2, 1943, he voluntarily told Mr. Carter that he had called a meeting for the purpose of raising some money to defray some of Mr. Carter's indebtedness; that at that time he had collected about twelve hundred dollars; that he did not know where the employees got the money they gave him; that he did not tell Mr. Carter how much had been collected; that he had not discussed the matter with Mr. Carter since February 2nd; that he had turned over to Mr. Geisert all the money he had collected, with the exception of about $183, collected since February 23rd, which money Mr. Kline still had in his possession. Mr. Kline was asked what Mr. Carter said when he told him what had been done, and he answered:

"Well, for a couple of minutes he did not say anything. He looked at me and he said, 'Mr. Kline,'—and I saw traces of tears in his eyes—he says, 'I think that that is one of the finest gestures that any body of men has ever offered to another man, and I don't know what to say.' 'Well,' I said, 'Mr. Carter, don't say anything.' I says, 'Let me do the saying and thinking.' And with that I got up and left the office."

As stated, Mr. Kline testified he did not again talk with Mr. Carter about the matter.

Mr. Roy Supplee did not attend the meeting of January 30th, as he was waiting on the counter. He testified that, the morning after the meeting, Mr. Kline told him what had happened; that nobody told him what his contribution would be, and he had paid nothing, and that nothing had occurred around the office to indicate there was any hard feeling toward him because he had not contributed; that he talked with Mr. Geisert and told him that he (Supplee) had a big family and did not feel that he could contribute, and that Mr. Geisert told him if that was the shape he was in they did not want him to give anything.

Mr. Duvall was also called and testified that he attended the meeting on January 30th; that he was advised by Mr. Kline of the amount of his contribution on Monday or Tuesday following the meeting; that he had paid nothing. He further stated that he was willing to make a donation, and told them he would pay his share the first of April.

While all of the men to whom we have referred, with the exception of Mr. Shorett, were employees in Mr. Carter's office, they were all called as the state's witnesses.

It appears definitely from this record that Carter's debts which the employees were going to liquidate were not debts incurred in his last campaign for county treasurer, but it does not appear definitely just how or when they were incurred, other than that they were debts which had been outstanding for some time.

While I am of the opinion that there is no testimony in the record which shows, or from which the jury would have a right to infer, that Mr. Carter authorized Mr. Kline to call the meeting of January 30th, or that he knew anything about it, there is testimony to the effect that Mr. Geisert paid two of Mr. Carter's bills from the money collected, although Mr. Geisert testified Carter knew nothing about his paying these bills until after they were paid.

The trial court seemed to be of the opinion that, inasmuch as some of the money collected was paid on Mr. Carter's bills, he received the benefit of it; and that if he knowingly received the benefit of it, he received it under the statute.

While I think the evidence conclusively shows Mr. Carter has never had physical control of any of the money collected, and while it is true that at least two of his bills were paid from this money, I do not believe these facts are of particular importance, in view of the conclusion I have reached. I am of the opinion the testimony of the witnesses produced by the state

conclusively shows that these contributions were voluntarily made by the employees, for the purpose of liquidating a specific amount of Mr. Carter's debts; that no pressure of any kind was brought to bear upon any of the employees to make such contributions; that, in so far as the wages of these employees were concerned, such wages were used only as a basis of determining the *pro rata* share of each employee, and that this basis was used only after it was suggested at the meeting by some one other than Mr. Kline, and apparently agreed to by all.

I am convinced that the testimony conclusively shows that the contributions made cannot be considered as "rebates," accepting as I do the common definition of that term, and assuming that under a proper state of facts Mr. Carter could, under the statute, be guilty of collecting or receiving from an employee a rebate of such employee's wages.

I recognize, I think, the purpose of this statute, and am entirely in accord with it, and, even if in this case it were made reasonably to appear that the method used was a subterfuge to avoid the statute, I would be inclined to look beyond the method employed; but from a close examination of the record I am convinced that the voluntary payments made or agreed to be made by Mr. Carter's employees, under the facts of this case, are not rebates, within the meaning of the statute.

The conclusion last above stated is not based upon the fact that Mr. Carter did not personally make the collection of this money from his employees, or that he did not know Mr. Geisert had paid some of his debts until after they were paid, or that he did not have physical possession of the money collected, as I can conceive of a situation where an elected public official might be convicted under the statute here involved, upon the theory of agency or ratification, where none of the above factors were present; but my conclusion is based upon the proposition that, under the facts in

this case, the contributions collected from the employees by Mr. Kline were not rebates, within the meaning of that word as used in the statute.

I do not mean to be understood as holding that, in order to convict an elected public official of a violation of this statute, it would be necessary for the state to prove that such official either personally or through an agent collected from his employees a part of their wages, by direct threat that if such contribution was not made the employee would lose his job; but I am of the opinion that the statute contemplates that, in order to convict one of its violation, the state must prove something more than that such contributions were voluntarily made by the employees, on a basis determined by them.

For the reasons herein assigned, I am convinced that the state failed to prove that Mr. Carter had collected or received from any employee a rebate of such employee's wages, and that the challenge to the sufficiency of the evidence, made by appellant at the close of the state's case, should have been sustained and the action dismissed.

I therefore concur in the result reached in the majority opinion.

SIMPSON, C. J., concurs with JEFFERS, J.

MILLARD, J. (concurring)—I also concur to the effect that, if a crime were charged, the evidence does not establish the charge.

ON REHEARING.

[*En Banc.* October 25, 1943.]

STEINERT, J.—On July 26, 1943, a department of this court rendered a decision, reported *ante* p. 590, 140 P. (2d) 298, reversing a judgment of the superior court for King county convicting and sentencing defendant, Carroll Carter, of and for the crime of collecting or receiving a rebate of employees' wages. That decision was encompassed in two separate written

opinions contemporaneously filed. One of the opinions, signed by the author thereof and concurred in by a second judge, was rested solely upon the ground that the allegations of the information against the defendant and the evidence in support of the charges did not constitute or establish a crime as defined by the applicable statute. A third judge concurred merely in the result of the reversal. A fourth judge, author of the other written opinion in the case, concurred in the result of the first opinion, but solely and expressly upon the ground that the state had failed to prove that the defendant had in fact collected or received from any employee a rebate of such employee's wages. The fifth judge concurred in the latter opinion. The second judge referred to above also concurred in that opinion to the extent of what was said therein with reference to the insufficiency of the state's evidence.

Upon the filing of the two opinions, the prosecuting attorney for King county filed a petition for rehearing, upon several alleged grounds: (1) that the opinion of only three judges holding the applicable statute ineffective as to the charges involved in the information does not constitute a decision by the supreme court in accordance with the requirements of Art. IV, § 2, of the Washington constitution; (2) that another charge of a similar nature is pending against the defendant, and public interest requires that the question of the effectiveness of the pertinent statute be decided by the entire court after a hearing *En Banc*; and (3) that the concurring written opinion referred to above failed to take into consideration certain vital evidence upon which the jury was entitled to find the defendant guilty of the charges contained in the information.

The petition for rehearing was granted; the cause was subsequently reargued before the entire court; and the matter was thereafter assigned for a further opinion.

The information in this case contained eight counts, each of which charged the defendant, Carroll Carter, with the commission of the crime of collecting or receiving from an employee in the office of the county treasurer of King county a rebate of a part of the wages theretofore paid to such employee by the county. The evidence adduced by the state in support of the charges may be summarized as follows:

On January 11, 1943, the defendant took office as county treasurer of King county. Immediately prior to that time he had been holding the office of county clerk of the same county. During a period of many years preceding his most recent induction into office, he had contracted an indebtedness of approximately thirty-five hundred dollars, the greater part of which was for political expenditures. In consequence of his financial condition, an arrangement had been made whereby a finance company in Seattle received the checks for salary earned by the defendant as county clerk and made payments therefrom upon his indebtedness.

Throughout the fall of 1942, Ernest A. Geisert, right-of-way agent in the county engineer's office, managed the defendant's campaign for the office of county treasurer. During that same period, and for many years prior thereto, Earl S. Kline had been employed in the county treasurer's office, in charge of the warrant department, at a salary of two hundred dollars a month. When the defendant took office as county treasurer on January 11, 1943, he appointed Geisert as one of his deputies and elevated Kline to the position of chief clerk in that office, at an increased salary of two hundred sixty-five dollars a month. The other employees, including those who had been permitted to retain their former connection with the county treasurer's office, were also given increases in salary. These increases were effected by reducing the total number of employees in the office as provided for in the existing

budget and dividing among the remaining employees the amount thus saved.

In the latter part of January, 1943, Geisert at the instance of the defendant called on the finance company to ascertain the amount of defendant's outstanding indebtedness and learned that it approximated thirty-five hundred dollars. The purpose at that time was to secure from a bank a loan in the necessary amount, upon defendant's promissory note which Geisert was to execute as cosigner.

About that same time, Kline, learning from general rumor that defendant was heavily involved financially, conceived the idea of having the employees in the county treasurer's office raise, among themselves, a fund with which to pay off a substantial part of defendant's indebtedness.

In a conversation with Geisert on Friday, January 29th, Kline learned what the amount of that indebtedness was, and on the same day he posted notice of a meeting of the office employees to be held the next afternoon.

At that meeting, which was attended by all of the appointive office employees, Kline opened the discussion by stating that their "new boss," the defendant, had taken steps to see that they were well treated, and that they should all feel satisfied to work for "a man like that." Then, after explaining that the defendant had contracted a "political debt" of about thirty-five hundred dollars, Kline stated that the meeting had been called to ascertain the opinion of those present "as to liquidating the debt for Mr. Carter." After some general discussion, it was suggested that the amount be raised by contributions from the employees in proportion to their respective salaries. The suggestion was adopted and Kline agreed to compute the amount of each employee's proposed contribution and make the collections accordingly. The defendant was not present at that meeting, and it was understood by

those in attendance that the matter was to be kept secret from him until the full amount was raised, his outstanding debts paid, and receipts therefor presented to him.

Pursuant to the understanding previously had, Kline computed the amounts of the expected contributions on the basis of a sum equivalent to ten per cent of each employee's salary during each of the next three months. On the following Monday and Tuesday, February 1st and 2nd, Kline collected from a number of the employees a total sum of about twelve hundred dollars, and turned the amount over to Geisert, who placed it in the county treasurer's vault, in a safe deposit box, or compartment, to which Geisert alone had a key. Some of the employees, however, being or becoming dissatisfied with the proposed arrangement for contribution, declined thereafter to take part, and later voluntarily resigned their positions.

Because of rumors that in the meantime had been circulating in the courthouse concerning the meeting of the previous Saturday, Kline on Tuesday, February 2nd, went to the defendant privately and explained to him fully all that had been done in the way of raising the intended contribution. The defendant expressed his surprise, but at the same time voiced his deep appreciation.

About this same time, some one, whose identity was not revealed at the trial other than that he was in the treasurer's office, made complaint to the chief deputy prosecuting attorney that the employees in the office of the treasurer were rebating a portion of their wages to the defendant. The chief deputy at once called on the defendant and asked for an explanation. Defendant admitted the fact of his personal indebtedness; admitted that he knew that a meeting of his employees had been held and a fund raised; and admitted that twelve hundred dollars thus collected was then in the treasurer's office safe. He denied, however, that he

had authorized the meeting, or that he had known any-thing about it prior to, or during, the time it was held, or that he had anything to do with raising the funds.

Thereafter, the prosecuting attorney himself called on the defendant and was given the same version of the matter. The prosecutor, however, took the position that the money should be returned at once to the employees and so advised the defendant. The prosecutor then further stated that, unless the money was returned, he would be compelled to file charges against the defendant. Throughout that conversation, defend-ant insisted that the contributions did not constitute rebates, and that there had been no violation of law. About two weeks later, the money not having been returned to the employees, the prosecutor filed the information involved in this appeal. Thereafter, Kline continued to make collections from the employees, down to the time of the trial in the superior court. The total amount collected by him and turned over to Geisert was $1,428.

The jury returned a verdict finding defendant guilty upon each of the eight counts of the information. From the judgment on the verdict, the defendant appealed.

The question to be determined in this opinion is whether the evidence as outlined above is sufficient, under the particular statute here involved, to convict the defendant appellant of the crime of collecting or receiving from a county employee a part of the wages theretofore paid by the county to such employee.

The statute on which this prosecution is based is § 1, chapter 72, p. 187, Laws of 1941, now appearing as Rem. Supp. 1941, § 7612-21. That section is embodied in a legislative act dealing with the rebate of wages and entitled:

"An Act relating to labor; declaring the rebating of wages, underpayment of agreed wages and certain deductions from wages to be unlawful; providing penalties; and amending section 1 of chapter 195 of the Laws of 1939."

To make clear our subsequent discussion, we quote the body of the act in its entirety:

"Section 1. Section 1 of chapter 195 of the Laws of 1939 (section 7612-21 of Remington's Revised Statutes, supplement; section 3552-31 of Pierce's Code) is hereby amended to read as follows:

"Section 1. *Any employer or officer, vice-principal or agent of any employer, whether said employer be in private business or an elected public official, who*

"*(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee*; or

"(2) Wilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; or

"(3) Shall wilfully make or cause another to make any false entry in any employer's books or records purporting to show the payment of more wages to an employee than such employee received; or

"(4) Being an employer or a person charged with the duty of keeping any employer's books or records shall wilfully fail or cause another to fail to show openly and clearly in due course in such employer's books and records any rebate of or deduction from any employee's wages; or

"(5) Shall wilfully receive or accept from any employee any false receipt for wages;

"Shall be guilty of a misdemeanor." (Italics ours.)

The information in this case charges a violation of that portion of the statute appearing above in italics.

Section 2 of the original act, passed in 1939 (Laws of 1939, chapter 195, p. 648, § 2; Rem. Rev. Stat. (Sup.), § 7612-22 [P. C. § 3552-32]), was not affected by the 1941 act. It provides that § 1 of the act shall not make it unlawful for an employer to withhold or divert any portion of an employee's wages when required or empowered so to do by state or Federal law or when a *deduction* has been expressly authorized in writing in advance by the employee for a lawful purpose accruing to the benefit of such employee, nor shall § 1

make it unlawful for an employer to withhold *deductions* for medical, surgical, or hospital care or service, pursuant to any rule or regulation, provided that the employer derives no financial benefit from such *deduction* and the same is openly, clearly, and in due course recorded in the employer's books.

▮ One of the questions presented upon the appeal is whether the appellant herein is an "employer" within the meaning of the act here involved. Since that question is fundamental to a further consideration of the case, we give it our first attention.

The comprehensive scope of the term "employer" as used in the act is indicated by the accompanying phrase "whether said employer be in private business or an elected public official." Giving that phrase its full significance, we think it is plain that the antecedent word "employer" is used in the act in a two-fold sense: (1) as referring to the individual, association of individuals, or corporation engaged in private business, for whom an employee performs the services for which he is hired; and (2) as referring to a person, such as an elected public official, who is authorized to appoint or hire another person to perform services for a municipality or governmental agency of which the elected official is the head.

The county treasurer, who is an elected public official, is by law authorized to appoint deputies and to remove them at his pleasure. Rem. Rev. Stat., § 4108 [P. C. § 1822]. In the one sense, then, the county is the employer of appellant's deputies, and in the other sense the appellant himself is the employer. By specific inclusion in the statute itself, and by accepted definition as well, the appellant was, and is, an "employer" within the meaning of the legislative act.

▮ The crucial, as well as the difficult, question presented by this case concerns the word "rebate," taken in connection with the word "wages," as those words appear in the statute.

It will be noted that the legislative act in question relates to *labor* and *wages,* and that the fundamental purpose of the legislation, as expressed in both the title and the body of the act, is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages. The act is thus primarily a protective measure, rather than a strictly corrupt practices statute. In other words, the aim or purpose of the act is to see that the employee shall realize the full amount of the wages which by statute, ordinance, or contract he is entitled to receive from his employer, and which the employer is obligated to pay, and, further, to see that the employee is not deprived of such right, nor the employer permitted to evade his obligation, by a withholding of a part of the wages, or by a device calculated to effect a rebate of a part of them, or by having the employer's books purportedly show an overpayment of compensation.

Following somewhat the thought above expressed, appellant contends that the word "rebate" means the return of something to the source from which it originally came, and that since, in this instance, the wages of the employees were paid by the county, there can be no *rebate* thereof unless the portion returned finds its way back into the funds of the county. Dictionaries are resorted to by appellant for etymological definition of the word.

It is at once apparent, of course, that if appellant's contention be upheld, then no "elected public official" could ever be guilty of the crime defined in the Laws of 1941, chapter 72, § 1(1), (Rem. Supp. 1941, § 7612-21(1)), because all elected public officials pay their employees from tax funds rather than from their own money. It is hardly to be supposed, however, that the legislature intended to stultify itself by enacting into the law a provision which on its face could have no possible application or effect. It is quite clear to

us, from the language of the statute itself, that the legislature intended to, and did, make it unlawful for an elected public official to collect or receive a rebate, or return, of any part of an employee's wages, whether the money so rebated or returned goes into the coffers of the county or into the pocket of the elected public official who has the authority to appoint and to remove the employee. A ball may *rebound* without bouncing all the way into the hand of the one who threw it.

While the appellant in this case may not be an employer in the sense that the services performed by the employees in his office are rendered for him personally, he is an employer, in the sense indicated above, that he is authorized to appoint and discharge the employees in that office. If, then, there is in fact and law a "rebate," or return, of a part of the wages of a county employee, it is within the inhibition of the statute, regardless of whether the money resumes its character as part of the funds of the county, or whether it stops midway, in the hands of the particular elected public official.

However, this conclusion does not entirely solve the problem with which we are here concerned. Adverting again to the language of the legislative act here involved, we find that the statute does not expressly nor impliedly forbid the making of *donations or contributions* by the employee to the employer, whether the latter be engaged in private industry or be an elected public official.

While occasion for the manifestation of such generosity on the part of the employee may not be frequent nor the privilege often exercised, there is nothing in the statute which proscribes such efforts. Having once received his wages in full, the employee is at liberty to do what he will with his earnings, so long as he does not violate some positive rule of law governing his action. He may keep the money in his pocket, invest it, spend it, or give it away. He may donate a

part of it to a private charity or he may, in the absence of a statute forbidding him to do so, contribute it to the cause of one seeking election to public office. He may likewise give it to one who has already been elected to such office. If the contribution be in fact a voluntary donation, it does not necessarily constitute a rebate of wages merely because it moves to, or for the benefit of, the employer.

In such transactions, there is always involved, of course, the question whether the act has been voluntary or involuntary; that is, whether the transaction in reality is a donation or whether it has assumed that aspect merely to cloak a form of compulsion. While the circumstances in one case may be such as to demonstrate that the act of the apparent donor was the product of some form of duress, the circumstances surrounding another case may show that the person making the gift acted freely and without constraint. If an employee exercises his free choice in making a contribution, even though in response to a request, his act does not amount to a rebate of his wages within the meaning of the statute above quoted.

Had the legislature intended to put its stamp of disapproval upon all forms of contribution of money or other property by county employees to elected public officials, it could have done so easily in language clear and explicit. It could have provided that it shall be unlawful for any county employee to give, contribute, or even lend to any elected public official, or for any such official to solicit, demand, or receive any gift, payment, contribution, assessment, subscription, or promise, of money, property, or other thing of value from any county employee, for any political or private purpose whatever. In fact, the cases on which the state largely relies herein did contain similar provisions with respect to acts of public officials. See *United States v. Curtis*, 12 Fed. 824; *Ex Parte Curtis*, 106 U. S. 371, 27 L. Ed. 232, 1 S. Ct. 381; *United States v. Wurz-*

*bach,* 280 U. S. 396, 74 L. Ed. 508, 50 S. Ct. 167; *Commonwealth v. McCarthy,* 281 Mass. 253, 183 N. E. 495, 85 A. L. R. 1141. Our legislature did not see fit to incorporate into the present law any provisions comparable to those mentioned above, nor is it permissible by interpretation to read such provisions into the statute.

■ The evidence in this case establishes nothing more than that the so-called "rebates" were voluntary contributions by the employees to, or for the benefit of, the appellant. In fact, it does not appear from the evidence that the contributions were made by the employees out of their wages. For aught that is shown, the amounts paid by them may have come from other personal funds in their possession. However that may be, there is no evidence that the employees were laboring under any duress or that their contributions were in any respect other than voluntary. Conceding, even, that they were made upon request, there is still no evidence that their response was not of their own free choice.

We affirm the result of our former decision, and therefore reverse the judgment of conviction, with direction to the trial court to dismiss the information.

SIMPSON, C. J., MILLARD, ROBINSON, and GRADY, JJ., concur.

JEFFERS, J. (concurring in the result)—While I concur in the result reached in the majority opinion, I do so for the reasons assigned in my concurring opinion, *ante* p. 594.

BEALS, J. (concurring in the result)—I concur in the result reached by the majority for the reasons assigned by Judge Jeffers.

MALLERY, J. (concurring in the result)—I concur in the result for the reasons stated in the departmental opinion, *ante* p. 590.

BLAKE, J., dissents.