[No. 24210. *En Banc.* March 7, 1933.]

FRED C. POWELL *et al., Respondents,* v. REPUBLIC CREO-
SOTING COMPANY, *Appellant.*[1]

*Harroun, Maloy & Shidler,* for appellant.
*Howard A. Hanson,* for respondents.

TOLMAN, J.—Respondent Powell, who had been the manager of the Seattle branch of the defendant's business since 1916, resigned his position, effective December 1, 1930; and conceiving that he had not been paid in full for his services, brought this action claiming a balance of $2,153.80 due him for that part of the year 1930 over which his services extended. The case was tried on the merits to the court, sitting without a jury, resulting in findings and conclusions favorable to the plaintiff and a judgment thereon for the full amount demanded. From that judgment, the defendant has appealed.

The parties do not differ greatly as to the fundamental facts, but they are poles apart in the infer-

[1]Reported in 19 P. (2d) 919.

ences and conclusions to be drawn therefrom. Stated briefly, what we regard as the governing facts are substantially as follows:

Respondent Powell, in 1913, was the city engineer of the city of Wenatchee, having a salary of $2,400 per annum with the privilege of engaging to some extent in the private practice of his profession. He became acquainted with the manager of the Minneapolis plant of the appellant company, a Mr. Larkin, and through him accepted an offer to move to Minneapolis, enter the employ of the appellant and apparently learn the business by working under Larkin. He remained there for some two years, receiving a salary of $2,500 per year, and perhaps a small bonus payment at Christmas time. In the latter part of the year 1915, the appellant company established a plant in the city of Seattle, and respondent Powell was sent there to manage that plant, beginning his services about the first of the year 1916.

For the years 1916 to 1919, inclusive, he was paid a salary at the rate of $3,600 per year in semi-monthly installments, and during those years he received a bonus, at or near the end of the year, in 1916, of $50; in 1917, of $200; in 1918, of $400, and in 1919, of $900. In 1920, his salary was $4,500, his bonus was $1,000. From 1921 to 1928, inclusive, his salary was $5,000 per annum and his bonuses were: 1921, $1,250; 1922, $1,500; 1923, $2,000; 1924, $2,150; 1925, $2,300; 1926, $2,500; 1927, $3,000; 1928, $3,150. In 1929, the last full year of his employment, he was paid a salary at the rate of $5,000 until October 1, when at his request his salary was increased by the sum of $100 per month, dating from October 1, 1929, and he therefore received in 1929 $5,300 as salary. In that year, he received as a bonus $3,250.

It will be observed that, from 1919 to 1929, inclusive,

a period of eleven years, respondent Powell's annual compensation increased substantially and with some degree of regularity, mostly by reason of the bonus payments, which (except in the year 1920, when the percentage was slightly less) ran in amount from twenty-five per cent to as high as sixty-three per cent of his stated salary.

Respondent contends, and the trial court held, in effect, that this course of dealing was sufficient to constitute an implied contract between the respondent and the appellant that respondent should be compensated, in addition to his regular salary, by an adjustment at the end of each year, so that each year's total salary would at least equal the preceding total annual salary, and might exceed it if his efforts and the resulting prosperity of the business should indicate the justice and wisdom of increasing the salary by a bonus payment when the result of the year's business became apparent.

Upon the other hand, the appellant contends that the annual adjustments were gifts or bonuses pure and simple, made as a matter of generosity or as a matter of discretion to cement the loyalty and increase the efficiency of the employee. It accordingly contends that, in the year in which his resignation took effect, he, having received his salary at the rate of $6,200 per annum in semi-monthly payments up to December 1, was thereby paid in full, and had earned and is entitled to no additional or adjusted compensation for the eleven months of the year which he worked.

Mr. Reilly, the president and managing head of the appellant corporation, testified:

"The method and the time or times of taking up or determining the bonus, whether one was to be paid, and the amount, was that there was a general habit, but no hard and fast rule. I was of the mind that the

company in the holiday season at the end of the year should show its appreciation to the employees who had shown their appreciation of their job, and who had worked faithfully and loyally to promote the company's interests.

"I took the matter up about the holiday period. I would know what the company's earnings were up to the first of December. I would then observe the volume of business done up to the time that I was considering the matter of bonuses. I would approximate the profits to be earned by the company in December. I would consider its cash position, as well as its business position, and then would make the distribution based on these facts as I observed them."

■ Accepting all this at its face value, still we think, in view of the substantial amounts paid regularly over a long term of years, there was here something more than a pure gratuity.

In the beginning, the payment of $50, the bonus for the year 1916, may have been a gratuity only. Possibly the two succeeding years, when the bonus payments were $200 and $400 respectively, show nothing more than gratuities, but the eight years following, with substantial payments regularly made and regularly increasing, would seem to be something quite other than mere gifts, and to our minds this course of dealing suggests rather conclusively an implied agreement that respondent's annual salary should be the stated amount payable semi-monthly plus such additional sum as would be reasonable in the light of the services rendered for the particular year and the results accomplished thereby.

To illustrate, an employee who had actually received as compensation $8,000 for the year 1927 might be very glad to continue in the service upon the understanding that he would receive a like amount or more in succeeding years if his services and their results justified such a rate of pay; but if he felt that he was

only legally entitled to a salary of $5,000 for the succeeding year and perhaps a gift over, would he not very likely be on the lookout for another position where his true worth would be recognized by an enforceable contract? Since both sides recognize that the employment might have been terminated at any time by either party, was not respondent induced to continue by the belief that he was to receive a salary of at least $8,000?

It does not necessarily follow that the total compensation earned by the respondent in 1930 must equal or exceed the total earned in 1929, because results were a factor to be taken into consideration each year in determining the value of respondent's services. The appellant might have pleaded and proved, if such were the fact, that respondent's services resulted in less profit to the company in the last year, or even that the profits of the company fell off without fault on the part of anyone, thus making the business as a whole less prosperous, less able to pay, less profitable to its stockholders and all concerned, and, of course, the services of everyone connected with it would, under those conditions, be less valuable than in the years of prosperity. Nothing of this kind was even suggested in the pleadings or hinted at in the testimony. On the contrary, it was shown that other branch managers received larger bonuses in the year 1930 than they did in the year 1929.

Respondent relies upon the case of *Scott v. Duthie & Co.*, 125 Wash. 470, 216 Pac. 853, 28 A. L. R. 328, and similar authorities. Appellant argues that these cases are based upon express contracts, and are therefore not applicable here. We are not advised that implied contracts differ in any degree from express contracts in the requirements as to mutuality and consideration.

Here, as in the *Scott* case, we can find both mutuality and a sufficient consideration to support the contract.

As early as 1919, by conduct which was thereafter continued, the employer began to hold out to the employee the offer or implied promise that, if he would continue in the service (which he was not otherwise required to do), his compensation would be adjusted annually on a basis of reasonable value. The employee accepted the offer by continuing in the service; hence there was mutuality and a consideration moving to the employer, just as in the *Scott* case, *supra*. In discussing this question, it was there said:

"The promise here was, therefore, no 'nudum pactum' on that theory, nor is it one on the theory that the promise was one for additional pay to be given one already under contract to do the very work for which the additional pay was promised. The argument that the appellant cannot recover the bonus for the reason that he was paid his regular salary while in the respondent's employ overlooks the very idea conveyed by the word 'bonus,' which is 'an allowance in addition to what is . . . stipulated.' Standard Dictionary. The complaint shows that the appellant was free to quit his work at any time, and therefore was under no obligation to do the thing which the respondent was seeking to accomplish by its offer. The compliance with the terms of the offer created a contract supplementary to the contract of employment. By this supplementary contract the respondent agreed to reward the appellant for remaining in its employ and refraining 'from accepting employment elsewhere until this company shall complete the ships.' "

We conclude, therefore, that the trial court did not err in holding that respondent was entitled to compensation in the year 1930 at the same rate as was received in the year 1929.

The judgment is affirmed.

BEALS, C. J., MAIN, PARKER, MITCHELL, BLAKE, HOLCOMB, and MILLARD, JJ., concur.

STEINERT, J. (dissenting)—I am unable to concur in the foregoing opinion. The sole question is whether certain bonus payments made by the appellant employer to the respondent, a local sales manager, were gratuities or whether they constituted, by an implied agreement, a part of the latter's annual salary. The majority seem to concede that these payments, so far as the years 1916, 1917 and 1918 were concerned, amounting to $50, $200 and $400, respectively, were "possibly" nothing more than gratuities. They conclude, however, that the payments made in subsequent years, being of substantial size and of regular occurrence and increasing amounts, constituted such a course of dealing as to raise an implied agreement to continue them from year to year and in such amounts as, taken in connection with the fixed or stated salary, would be reasonable in the light of the services rendered and the results accomplished thereby. It will be noted that there was no change in the course of dealing from 1916 down to 1929; the only change was that the amounts kept increasing. This is made the basis of the implied agreement.

Now, I take it that the most potent factor in determining the character of these payments is the intention of the parties. That intention is best divined from what they themselves said and did. The bonuses were sent at or about the time of the Christmas holidays. With one exception, they did not await the annual closing of the company's books, when the amount of profits could be definitely ascertained, but resulted rather from an estimate, fairly deducible of course, of what the business had done during the current year. The bonus checks were regularly accompanied by personal letters from Mr. Reilly, the president of the corpora-

tion. In order to understand the spirit in which they were written, we will quote them:

"My Dear Fred:—                    January 16, 1923.
    "I take very great pleasure in handing you the enclosed with which goes my very best wishes to you and family.
    "I enclose herewith a letter to Mr. Spencer.
                "Yours very truly,
                    "REPUBLIC CREOSOTING COMPANY,
                        "P. C. Reilly, President."

"Dear Fred:—                    December 24th, 1926.
    "Christmas is here again and it reminds me the Indianapolis office should send to our Seattle associates a souvenir of the Holiday period. It is unnecessary for me to say it gives me a great pleasure to do so.
    "A most Happy Christmas to you and family.
                "Yours very truly,
                        "P. C. Reilly."

                    "December 24, 1927.
    "With the enclosed goes my very best wishes for a Merry Christmas and Happy New Year.
                "Sincerely,
                        "P. C. Reilly."

                    "December 24, 1928.
    "With the enclosed goes my best wishes to you for a very happy Christmas and New Year.
    "I feel that 1929 shall be an enlarged and prosperous year for Seattle.
                "Sincerely,
                    "By P. C. Reilly, President."

                    "January 4, 1930.
    "I enclose herewith the bonus checks for yourself, Miss Caughlin, Mr. Sullivan and Mr. Tollefson, which please distribute to them.
                "Yours very truly,
                        "P. C. Reilly."

On three of these exhibits, introduced by respondent, are notations indicating that respondent received

$1,500 in 1923, $3,000 in 1927, and $3,150 in 1928. At the same time, the exhibits also show, by notations thereon, that other employees were receiving bonus payments varying from $50 to $150. If the reasoning of the majority be correct, then it would seem that the bonuses paid the other employees, being small in amount, were mere gratuities, while those paid at the same time to the respondent were based upon an implied agreement to pay them. I can not follow that reasoning.

Turning now to respondent's attitude with reference to these payments, we have also a series of letters written in longhand by him. They are too numerous to quote *seriatim*. A few will suffice.

They are all of the same general tenor.

"My Dear Mr. Reilly:                    Dec. 30, 1924.

"I have just received your kind and generous Christmas remembrance and I can not fully convey to you my appreciation of it and the spirit in which it was given.

"I trust that this year will entirely obliterate any doubts in your mind as to myself and this plant, and you may be sure a one hundred percent effort will be made for the success of this branch and the Company.

"With best wishes to yourself and family for happiness and prosperity in 1925.

"Sincerely yours,

"Fred Powell."

"My Dear Mr. Reilly:                    Dec. 29, 1925.

"The Christmas check was most generous and I am sure you know it was fully appreciated—together with your kind wishes to myself and the family, for all of which we thank you.

"I realize quite well that this was not a good year for the Seattle plant but the outlook for next year is better we think and will strive for a good result.

"We are all looking forward to another visit from you, out west, and hope that it will materialize, and that your family can accompany you. A wonderful

summer could be had on the West Coast and would like to assist in planning such a trip.

"With best wishes to you and your family for the New year.                    Sincerely yours,
                                        "Fred Powell."

"Dear Mr. Reilly:                        12/31/27.
"I want to thank you many times for your Christmas greetings and check. The amount was indeed generous and I want you to know it is appreciated from the bottom of my heart.

"With very best wishes to you and all the Reillys for 1928, I am,                    Sincerely yours,
                                        "Fred Powell."

"Dear Mr. Reilly:                        Jan. 12, 1930.
"I wish to acknowledge receipt of, and thank you for, Christmas check.

"Miss Caughlin, Mr. Sullivan and Mr. Tollefson also desire me to express their appreciation and thanks.                    Yours very truly,
                                        "Fred Powell."

It seems to me that these letters indicate clearly that these bonus payments were in no sense considered obligatory. Undoubtedly, they were given in appreciation of service in the past and to stimulate increased effort in the future. Undoubtedly, too, they continued with such unfailing regularity as to create a hope, amounting to an expectant certainty, that they would not suddenly stop. But I see no element of contract, express or implied, in the situation. If there is, then every department store that sees fit to reward its employees with a bonus at Christmas would be subjecting itself to the risk of establishing a procedure fraught with results that they never contemplated.

Respondent makes the contention that his total salary consisted of two parts: (1) the fixed monthly amount considered as a "drawing account," and (2) the deferred salary, determined at the end of the year.

As evidence of the fact that that was the arrangement and understanding between the parties, respondent offered in evidence a letter written by appellant's president under date of December 2, 1929, reading as follows:

"I told you when West I would look into the matter of giving you a larger drawing account. Dating from October 1st we will make it $100 a month larger than heretofore, and to cover the months of October and November I enclose you check for $200.

"Yours very truly,
"REPUBLIC CREOSOTING COMPANY,
"P. C. Reilly,
"President."

This letter, it must be remembered, was written December 2, 1929, long after the implied agreement was established according to respondent's contention, and but a year before the relationship between the parties came to an end. It is but a single, isolated letter out of many years of correspondence. One flake does not constitute a snowstorm, nor is a course of dealing established by a single letter. Though the term "drawing account" may have been somewhat inapt to designate and describe a fixed and total salary, it is not inconsistent with the idea that respondent was employed at a fixed and determined amount for the year, payable monthly, and that the matter of Christmas bonuses, both as to certainty and amount, depended entirely upon the donor and not upon the expectant hope of the donee.

But assuming all that respondent contends for in his interpretation of this one letter, it still does not create an obligation to do anything more than what is contained therein. There is, of course, no contention that there was any express agreement to pay a bonus, and if there was an implied agreement to pay it, there still was no certainty of detail upon which it could rest.

It still remained discretionary with Mr. Reilly as to how much the company could afford to, and cared to, give. If respondent's contention be upheld, then the company could never safely allocate its earnings to any sort of building program that it might entertain, or to any of the many different kinds of expansion that the growth of its business warranted. The company would be compelled to divide its earnings each year among its various sales managers and such of its employees as it had theretofore preferred.

When the respondent left appellant's employ, he was earning a fixed salary of $6,200 per year. He quit voluntarily in December, 1930. Presumably, he had his reason for so quitting. He undoubtedly thought that he could better himself, even at the salary that he was getting. He is not prevented from associating himself with a rival concern, bringing to it the value of his experience with the appellant. The very purpose of the bonus, so far as continued service with the appellant is concerned, is defeated under the majority opinion. The employer may content itself that it has been generous, but may doubt whether it has been altogether wise.

I must dissent from the conclusion and result reached by the majority.