[No. 67034-4-I.   Division One.   December 3, 2012.]

SHAUN LACOURSIERE, *Appellant*, v. CAMWEST DEVELOPMENT, INC., ET AL., *Respondents*.

*Daniel R. Case* (of *Larson Berg & Perkins PLLC*), for appellant.

*James M. Shore* and *Karin D. Jones* (of *Stoel Rives LLP*), for respondents.

¶1 SPEARMAN, A.C.J. — To be considered compensation protected by the provisions of Washington's antikickback statute, chapter 49.52 RCW (the Wage Rebate Act or WRA), a bonus that is discretionary must be given regularly to create an implied contract and reliance, otherwise it is a mere gratuity. Additionally, the Wage Rebate Act is violated only where an employer collects a "rebate" of wages already paid.

¶2 Here, the discretionary bonuses provided to Shaun LaCoursiere by his employer CamWest Development were not given regularly, did not create an implied contract that they would be paid every year, and LaCoursiere could not have relied upon them, given he knew CamWest had no obligation to provide them. Moreover, even if the bonuses amount to wages, the record here shows there was no rebate to CamWest and that instead, CamWest paid LaCoursiere precisely as he agreed to be paid under the employment contract. As such, the trial court properly dismissed LaCoursiere's WRA claim, and we affirm that order.

¶3 We reverse, however, the court's order denying Cam-West's motion for attorney fees. A trial court may award attorney fees for claims other than breach of contract when the contract is central to the existence of the claims, i.e., when the dispute actually arose from the agreements. Here, LaCoursiere's claim arose out of the parties' employment agreement and that agreement was central to the dispute.

¶4 Affirmed in part, reversed in part, and remanded for further proceedings.

## FACTS

¶5 CamWest Development Inc. is in the business of building new homes in King and Snohomish Counties. Eric Campbell is president of CamWest. Shaun LaCoursiere started working at CamWest in May 2003. On January 1, 2005, CamWest promoted LaCoursiere to the position of project manager, entering into a written employment agreement with LaCoursiere.

¶6 Under the employment agreement, LaCoursiere agreed to participate in a discretionary bonus structure (the LLC Bonus Structure) associated with membership in CamWest Managers LLC (LLC). The LLC is a separate entity from CamWest. Its primary purposes are to loan money to CamWest for real estate investment and to provide a return to its members. The LLC's members consist primarily of CamWest management employees who have chosen to acquire membership interests in the LLC.

¶7 The LLC Bonus Structure involves the payment of a discretionary bonus to CamWest's project managers, the amount of which is based upon employee performance and CamWest's construction profits. If CamWest exercises its discretion and issues a bonus to a project manager, the bonus is calculated and paid as follows:

- The Project Manager's performance for the year is rated on the basis of several criteria, and the Project Manager is assigned a score based upon that performance rating;
- CamWest credits the Project Manager with a percentage of the net profits generated by projects managed by the Project Manager that year;
- CamWest credits a percentage of the same net profits to a "pool" of funds;
- The Project Manager is credited with a pro rata share of the "Project Manager pool," based upon his performance rating for the year;

• CamWest distributes the resulting bonus amount to the Project Manager, with 44% of the bonus issued as a direct payment to the employee;

• The remaining 56% of the bonus is contributed to the Project Manager's capital account in the LLC.

Clerk's Papers (CP) 102-03, 160.

¶8 Once a project manager makes his first capital contribution to the LLC, he acquires a membership interest in the LLC. That interest is subject to a vesting schedule set forth in the LLC Agreement. A new member's membership interest in the LLC is 20 percent vested upon the member's first capital contribution. After the first anniversary of membership in the LLC, the individual's membership interest is 40 percent vested and thereafter vests an additional 20 percent annually. The above-described LLC Bonus Structure is voluntary, and some CamWest employees opt out of the LLC Bonus Structure, choosing to instead receive a pure percentage-of-salary bonus. Participation in the LLC Bonus Structure and membership in the LLC are not requirements of employment with CamWest.

¶9 When he was promoted, LaCoursiere reviewed and voluntarily signed the employment agreement. He testified that he did not need more time to review it, and that he did not sign it under threat of any kind. LaCoursiere received bonuses for three years: 2005, 2006, and 2007. For 2005, LaCoursiere's total bonus amount was $121,021.00. Of that amount, CamWest issued $49,961.80 (41.28 percent) as a contribution on behalf of LaCoursiere to the LLC. CamWest paid LaCoursiere directly in the amount of $30,255.25 (the remaining 58.72 percent of the bonus minus tax withholdings).

¶10 For 2006, LaCoursiere's total bonus amount was $98,690.00. Of that amount, CamWest issued $40,348.96 (40.88 percent) as a capital contribution on behalf of LaCoursiere to the LLC. CamWest paid LaCoursiere directly in the amount of $24,672.50 (the remaining 59.12 percent of the bonus minus tax withholdings).

¶11 For 2007, LaCoursiere's total bonus amount dropped to $31,745.00. Of that amount, CamWest issued $16,710.36 (52.64 percent) as a contribution on behalf of LaCoursiere to the LLC. CamWest paid LaCoursiere directly in the amount of $4,444.30 (the remaining 47.36 percent of the bonus minus tax withholdings).

¶12 Due to the economic downturn, CamWest did not pay any discretionary bonuses for work performed in 2008. LaCoursiere does not claim that he was entitled to any bonus for that year. In fact, he acknowledges that he was never told by CamWest management that he would "receive a bonus every year." CP at 56.

¶13 Because of reduced business in 2008, CamWest's need for project managers declined. Rather than immediately laying off the Project Managers, CamWest chose to transfer the affected employees to "Senior Laborer" positions, providing them with the option to leave if they did not want to accept the change in position. CamWest initiated two rounds of transfers and layoffs of project managers, ultimately reducing the number of project managers from approximately 27 to 12. LaCoursiere was one of the project managers affected by the second round. LaCoursiere chose to accept the transfer to senior laborer, rather than ending his employment with CamWest. According to CamWest, following his transfer to senior laborer, LaCoursiere demonstrated a pattern of poor attendance and punctuality. CamWest fired LaCoursiere on March 6, 2009.

¶14 According to the LLC Agreement, when a member of the LLC leaves CamWest, that individual must sell his membership interest to Eric Campbell, CamWest, or the remaining LLC members. For purposes of determining the individual's vested membership interest in the LLC, "the purchase and sale [of the membership interest] shall be deemed to have occurred upon the date of the event triggering the purchase and sale." CP at 196. "[I]n the event of the termination of a Member's employment with CamWest [the triggering event] shall be the date of such termination."

*Id.* On the date he was fired, LaCoursiere's membership interest in the LLC was 60 percent vested. LaCoursiere does not appear to dispute that he received payment for his 60 percent vested membership interest.

¶15 LaCoursiere sued CamWest and Campbell, arguing he was entitled to reimbursement for the full amount of his capital contributions to the LLC, and that those contributions amounted to violations of the WRA. CamWest moved for summary judgment, arguing the discretionary bonuses were not "wages" subject to the WRA. CamWest also sought prevailing party attorney fees under the employment agreement. The trial court granted the motion for summary judgment but denied CamWest's motion for fees. LaCoursiere appeals dismissal of his case, and CamWest cross appeals the order on its motion for fees.

## DISCUSSION

### *Discretionary Bonuses as Wages*

¶16 LaCoursiere argues the bonus structure set forth in CamWest managers' LLC agreement violates the prohibition against rebate of wages in Washington's antikickback statute, the Wage Rebate Act. We disagree.

¶17 The criminal provision of the WRA bars the rebate of wages back to employers:

Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who

(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee;

. . . .

Shall be guilty of a misdemeanor.

RCW 49.52.050(1). The Washington Legislature enacted the WRA as an antikickback statute in 1939 "to prevent abuses

by employers in a labor-management setting, e.g., coercing rebates from employees in order to circumvent collective bargaining agreements." *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 519-20, 22 P.3d 795 (2001). The " 'fundamental purpose of the legislation, as expressed in both the title and body of the act, is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages.' " *Id.* (internal quotation marks omitted) (quoting *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159, 961 P.2d 371 (1998)).

¶18 LaCoursiere contends the percentage of the bonuses (56%) that went into project managers' capital accounts in the LLC amount to prohibited wage rebates under RCW 49.52.050(1). A threshold question we must answer is whether the bonus structure described in the employment contract amounted to "wages" under chapter 49.52 RCW. LaCoursiere argues the bonuses are wages. He asserts that under *Flower v. T.R.A. Industries, Inc.*, 127 Wn. App. 13, 34, 111 P.3d 1192 (2005), wages are simply anything that is paid " 'by reason of employment' " (internal quotation marks omitted) (quoting *Hayes v. Trulock*, 51 Wn. App. 795, 806, 755 P.2d 830 (1988)). LaCoursiere misreads *Flower*, and moreover, the facts of that case are significantly different from those at issue here.

¶19 In *Flower*, an employer in Washington State, Huntwood, heavily recruited Wesley Flower, who lived with his family in Alabama. To entice Flower to accept its job offer, Huntwood offered him a $20,000 "moving allowance" consisting of $10,000 to cover moving expenses and a $10,000 signing bonus. The agreement further provided that all moving expenses over $10,000 reduced the signing bonus and that if Flower left the company within one year of employment, he agreed to repay the moving expenses. Flower accepted the job, sold his house, and relocated to Washington. His moving expenses were well under $10,000. Very shortly after his arrival, Huntwood fired Flower and

did not pay the bonus. Flower sued, and the trial court granted summary judgment in favor of Huntwood. This court reversed. Huntwood argued it was not obligated to pay the bonus because it was intended merely as an "expense" for Flower's relocation and further, that Flower was not entitled to it because he left the company within a year of being hired. *Flower*, 127 Wn. App. at 33. We rejected Huntwood's argument, not because all bonuses amount to wages but, rather, because "[t]he terms of the contract clearly state that the bonus is to compensate Mr. Flower for signing on with the company. His act of taking the job entitled him to the bonus." *Flower*, 127 Wn. App. at 36. Thus, we held only that Flower was entitled to the bonus because he had performed under the terms of the contract by signing with Huntwood. We did not hold, as LaCoursiere contends, that Flower was entitled to the bonus simply by reason of his employment with Huntwood.

■■ ¶20 It is undisputed that the bonuses at issue here are discretionary. Discretionary bonuses are generally considered gratuities and not wages. *Byrne v. Courtesy Ford, Inc.*, 108 Wn. App. 683, 690-91, 32 P.3d 307 (2001). But if the bonus is given regularly so as to create an expectation that it will continue, then it may be considered a wage under an implied contract. *Id.* "[T]o be considered compensation, a discretionary bonus must be given regularly to create an implied contract and reliance, otherwise it is a mere gratuity." *Id.* at 691. In *Byrne*, we held that an employee's bonus, which was a single television set given to the employee one year, did not establish reliance or an implied contract to include televisions as wages. *Id.* at 690-91. As such, the television was nothing more than a gratuity. *Id.*[1]

¶21 *Byrne* relied on two cases: *Simon v. Riblet Tramway Co.*, 8 Wn. App. 289, 505 P.2d 1291 (1973) and *Powell v. Republic Creosoting Co.*, 172 Wash. 155, 19 P.2d 919 (1933).

---

[1] LaCoursiere claims *Byrne* holds that discretionary bonuses are gratuities only if the bonuses are "unrelated to performance" of the job. But this holding is nowhere in *Byrne*.

In *Simon*, this court found an implied contract where the plaintiff received a bonus in each of the 10 years he was employed before leaving, and where his bonuses had increased or remained the same each year. *Simon*, 8 Wn. App. at 290-91. Likewise, in *Powell*, the court found bonuses amounted to wages where the employee received bonuses that increased in amount every year from 1916 until 1929. *Powell*, 172 Wash. at 156.

¶22 While the facts in this case are not as clear cut as those in *Byrne*, they are clearly distinguishable from those in *Simon* and *Powell*. Unlike the employees in *Simon* and *Powell*, LaCoursiere did not receive ever-increasing bonuses for more than a decade. Instead, he received bonuses in three of the four years he worked at CamWest: 2005, 2006, and 2007. As LaCoursiere admits, he received no bonus in 2008, and the three bonuses he did receive decreased each year. Moreover, LaCoursiere signed an employment contract in this case. That contract was remarkably clear regarding the nature of LaCoursiere's bonuses. CamWest could provide a bonus "in its sole discretion and determination." CP at 102. Indeed, LaCoursiere acknowledged to the superior court that CamWest was not obligated to give him a bonus every year: "the plaintiff is *not* arguing that an implied contract somehow obligates the defendants to pay him a fourth bonus (either in full, or in a pro rata amount)." CP at 394. Moreover, LaCoursiere admitted he was never told by CamWest that he would receive a bonus every year. Under these circumstances, the bonuses were mere gratuities: they were not given regularly, did not create an implied contract that they would be paid every year, and LaCoursiere could not have relied upon them, given he knew CamWest had no obligation to provide them. *Byrne*, 108 Wn. App. at 689, 691.

¶23 LaCoursiere also argues that even though CamWest had the discretion to pay no bonus at all, once it exercised its discretion and decided to pay a bonus, that bonus qualified as wages under the WRA and, as such, the

percentage of the bonus that was directed *into* his project manager capital account was a prohibited rebate. But even if the bonus did amount to wages, we reject LaCoursiere's argument. To violate subsection (1) of RCW 49.52.050, an employer must collect or receive a "rebate" of wages already paid. Here, there was no rebate to CamWest. Although LaCoursiere characterizes the capital account funds as having been "diverted" from him, they were not. Indeed, CamWest paid LaCoursiere just as he agreed to be paid under the employment contract, i.e., 44 percent of his bonus (less withholding) being paid directly to him, and 56 percent being paid into his own capital account with the LLC.

¶24 LaCoursiere implies the funds in the capital account were not truly his because he did not actively manage how those funds were used or invested. *See* Reply Br. at 8. But again, LaCoursiere agreed in writing that the funds in the capital account would be used "for loans to CamWest for its use as working capital." CP at 178. LaCoursiere also appears to argue CamWest received a rebate in that it distributed only 60 percent of the funds in his capital account at the time he left the company. *See* Reply Br. at 11 ("they *still* possess 40% of that sum and refuse to disgorge it"). This argument ignores the plain language of the LLC agreement, which contains a vesting schedule for capital account funds. Given LaCoursiere left when his capital account funds were only 60 percent vested, he received precisely the funds he agreed to receive when he signed the LLC agreement.

■ ¶25 Thus, even if the LLC Bonus Structure amounts to a prohibited rebate of wages, LaCoursiere knowingly submitted to the violation, and under the WRA, he cannot receive the benefits of the WRA:

> . . . PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

RCW 49.52.070. LaCoursiere claims this provision applies only if the employee knows about the rebates *and* also

knows the rebates are illegal under chapter 49.52 RCW. We reject this argument. LaCoursiere cites no authority for his proposition, and it is contrary to case law on the issue, which holds the requisite knowledge is not potential illegality under the WRA but is instead the employee's knowledge that he is deferring payment decisions to the employer. *See Chelius v. Questar Microsystems, Inc.*, 107 Wn. App. 678, 682, 27 P.3d 681 (2001) (knowing submission requires deliberately and intentionally deferring to employer's decision on payment).

¶26 Here, as is described above, LaCoursiere voluntarily entered into the employment and LLC agreements. These agreements made it clear that the bonuses were entirely discretionary, that the purpose of the capital accounts was to provide the LLC with capital, and that the capital account funds were subject to a vesting and forfeiture schedule. Under these circumstances, we conclude LaCoursiere "knowingly submitted" to any violation.[2]

¶27 We affirm the order granting CamWest's motion for summary judgment.

## Attorney Fees

¶28 On cross appeal, CamWest argues that the trial court erred by denying its motion for attorney fees under the employment agreement, which provides for prevailing party fees in the event of an action arising under the agreement. CamWest notes that the trial court interlineated in its order denying the motion for fees that the complaint alleged "only a violation of the Wage Rebate Act" and not breach of contract claims. CP at 525. CamWest contends this is an erroneous interpretation of the law

---

[2] LaCoursiere also cites *Champagne v. Thurston County*, 163 Wn.2d 69, 77 n.6, 178 P.3d 936 (2008) for the proposition that the WRA cannot be negated by contract. LaCoursiere does not explain this argument, and a review of *Champagne* makes it clear it has no application here. There, the court simply made the rather unremarkable observation that provisions in a collective bargaining agreement cannot supersede a Washington Administrative Code. *Id.* at 77 n.6.

because although LaCoursiere did include a breach of contract claim in its complaint, the action here arose out of the employment agreement and that agreement was central to the dispute. LaCoursiere does not respond to this argument. Instead, he asserts that "employers are never entitled to fees under the WRA" without acknowledging CamWest's argument.

¶29 We agree with CamWest on this issue. A court "may award attorney fees for claims other than breach of contract when the contract is central to the existence of the claims, i.e., when the dispute actually arose from the agreements." *Deep Water Brewing, LLC v. Fairway Res., Ltd.*, 152 Wn. App. 229, 278, 215 P.3d 990 (2009) (citing *Hemenway v. Miller*, 116 Wn.2d 725, 742-43, 807 P.2d 863 (1991); *Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n*, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991)); *see also Hill v. Cox*, 110 Wn. App. 394, 411-12, 41 P.3d 495 (2002) (contractual fees awarded when prevailing party elected to proceed on statutory tort claim rather than contract); *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wn. App. 834, 855-56, 942 P.2d 1072 (1997) (contract-based fees awarded for negligence claim when duty breached was created by parties' agreement); 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 14:18, at 357 (2d ed. 2007) (even in cases where plaintiff's claims are founded in tort or another legal theory, award of contract attorney fees may be appropriate).

¶30 Here, the terms and proper enforcement of the employment agreement is central to LaCoursiere's WRA claim. In other words, this action arose out of the parties' employment agreement and that agreement was central to the dispute. As such, the trial court erred in denying CamWest's motion for attorney fees, and we therefore reverse that order and remand for further proceedings.[3]

---

[3] In his reply brief, LaCoursiere suggests counsel for CamWest should be sanctioned "for violating ER 408 by improperly mentioning settlement discus-

¶31 We affirm the order dismissing LaCoursiere's claims against CamWest, but reverse the order denying CamWest's motion for fees, and remand for further proceedings.

SCHINDLER and DWYER, JJ., concur.

Review granted at 177 Wn.2d 1022 (2013).

---

sions" in the response brief. *See* Reply Br. at 2-3. We decline to impose sanctions. ER 408 does not prohibit any mention of settlement negotiations or render them privileged. Rather, the rule simply prohibits admission of settlement negotiations into evidence for the purpose of proving liability or amount of damages.