

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 2 3 2014

CHIEF JUSTICE

This opinion was filed for record
at 8:00AM on Oct 23 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

SHAUN LaCOURSIERE, a single individual, )
)
      Petitioner, )
)
v. )
)
CAMWEST DEVELOPMENT, INC., a )
corporation organized under Washington law )
and ERIC H. CAMPBELL, an individual, )
)
      Respondents. )
)
)

No. 88298-3

En Banc

Filed     OCT 2 3 2014    .

WIGGINS, J.—We must decide in this case whether a portion of the wages paid to plaintiff Shaun LaCoursiere was rebated to his employer or its agent in violation of Washington's wage rebate act, chapter 49.52 RCW.[1] LaCoursiere's employer, CamWest Development Inc. (CamWest), paid LaCoursiere three discretionary bonuses during the course of his employment. Pursuant to his employment agreement, a portion of LaCoursiere's bonus money was directly invested in a related company, CamWest Managers LLC (the LLC). When CamWest terminated LaCoursiere's employment before the investment fully vested, LaCoursiere lost a

---

[1] RCW 49.52.050(1) prohibits "[a]ny employer or officer, vice principal or agent of any employer" from collecting or receiving rebates "theretofore paid by such employer to such employee." For convenience, this opinion refers collectively to officers, vice principals, and agents as "agents."

portion of his investment in the LLC. We affirm the Court of Appeals' dismissal of LaCoursiere's claim. Even though the bonuses constituted "wages," there was no rebate of those wages because LaCoursiere's unvested interest reverted to the LLC and not to LaCoursiere's employer, CamWest. However, we reverse the award of attorney fees to CamWest because LaCoursiere's claim is grounded in the wage rebate act (WRA), under which reasonable attorney fees and costs are available only to prevailing employees.

## FACTS

CamWest specializes in residential construction. CamWest uses its related company, the LLC, to finance building projects. It is the sole business of the LLC to loan money to CamWest. Eric Campbell is the founder and president of CamWest and also the manager of the LLC.

In 2003 CamWest hired Shaun LaCoursiere as an assistant project manager. In 2005 LaCoursiere accepted a promotion to project manager. As part of this promotion, LaCoursiere voluntarily signed both an employment agreement (governing his employment and pay) and an LLC agreement (governing his participation in a profit sharing plan).

The employment agreement provided that in addition to LaCoursiere's annual salary, LaCoursiere may receive a discretionary bonus. If CamWest decided to issue a bonus, the bonuses were based on net profits from individual projects that LaCoursiere worked on and LaCoursiere's performance as a manager. CamWest would be free to weigh each of the work performance criteria differently as long as it evaluated all project managers using the same standards and gave each manager a

point score (100 points being the maximum score). After CamWest calculated the bonus, the employment agreement provided that after taxes, 44 percent of the bonus would be distributed to LaCoursiere and the remaining 56 percent would be distributed directly to the LLC (as part of the LLC bonus structure). Lastly, the employment agreement contained an attorney fee provision, which mandated that the prevailing party in any legal dispute arising under the agreement would be entitled to attorney fees and costs.

Upon his first capital contribution on May 15, 2006, LaCoursiere signed the LLC agreement and became a member in the LLC. Under the LLC agreement, the portion of LaCoursiere's bonus that went to the LLC served as capital to be lent to CamWest. In return, he received one "unit" of membership in the LLC for every dollar paid into the LLC and annual interest payments based on his relative ownership in the LLC as compared to other members. The LLC members accrue 20 percent of a full membership interest annually until they fully vest as members.

The LLC agreement also provided that if CamWest terminated LaCoursiere for cause, his interest in the LLC would be immediately sold. Upon sale, LaCoursiere would be entitled to the fair market value of the LLC divided by the total number of units held by the members as of the date of the fair market valuation, multiplied by the percentage of the member's vesting in the LLC. In other words, if LaCoursiere was 60 percent vested, he would receive 60 percent of his proportional interest in the LLC. The LLC agreement further provided that in the event of a sale, Eric Campbell, the founder and president of CamWest, would have the first right to purchase the units

3

and CamWest the second right to purchase. Any remaining units "shall be purchased by all of the Members on a pro rata basis."

In his first year as a manager, CamWest paid LaCoursiere an after-tax bonus of $80,217.05, with $49,961.80 of that bonus distributed directly to the LLC. The full details of LaCoursiere's net, after-tax bonuses are detailed below:

| Year of Bonus | Total Bonus | Portion Paid to LaCoursiere | Portion Paid to the LLC |
|---|---|---|---|
| 2005 | $ 80,217.05 | $ 30,255.25 | $ 49,961.80 |
| 2006 | $ 65,021.46 | $ 24,672.50 | $ 40,348.96 |
| 2007 | $ 21,154.66 | $ 4,444.30 | $ 16,710.36 |

LaCoursiere also received three yearly interest payments from the LLC, totaling $16,468.

The construction industry took a downturn in 2008, and CamWest demoted LaCoursiere to senior laborer and reduced his salary on December 12, 2008. Then, on March 6, 2009, CamWest terminated LaCoursiere due to his consistent tardiness. At this point, LaCoursiere's membership interest in the LLC was 60 percent vested.

Over the next eight months, LaCoursiere received payments for his 60 percent vested membership interest; before the final payout, he sued CamWest under the WRA. LaCoursiere argued that the profit sharing plan was a rebate under the WRA because the bonuses were "wages" once they were paid, and the plan was really a mechanism for CamWest to divert some of those wages back to itself. He sought statutory double damages of $323,387.14 plus costs and attorney fees.

The trial court granted summary judgment in favor of CamWest but denied CamWest's motion for attorney fees and costs. The Court of Appeals affirmed the

summary judgment order, holding that (1) the bonuses were not wages, (2) the bonuses were not rebated, and (3) LaCoursiere was not entitled to relief under RCW 49.52.070 because he knowingly submitted to alleged violations of the WRA. *LaCoursiere v. CamWest Dev., Inc.*, 172 Wn. App. 142, 151–53, 289 P.3d 683 (2012). Additionally, the Court of Appeals reversed the trial court's denial of the attorney fees on the grounds that the employment agreement was central to the dispute. *Id.* at 153-54.

## ANALYSIS

This court reviews an order of summary judgment de novo. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). We perform the same inquiry as the trial court and will affirm an order of summary judgment when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* This case presents three questions of law: (1) Whether the bonuses paid to LaCoursiere were "wages"; (2) if the answer is yes, whether the bonuses were rebated; and (3) whether CamWest is entitled to attorney fees pursuant to the employment agreement.

The WRA states in pertinent part:

Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who

(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee . . . .

. . . .

Shall be guilty of a misdemeanor.

RCW 49.52.050.

Passed in 1939, the WRA—also known as the "anti-kickback" statutes—was enacted by the legislature to "prevent abuses by employers in a labor-management setting, e.g., coercing rebates from employees in order to circumvent collective bargaining agreements." *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 519-20, 22 P.3d 795 (2001). "'[T]he fundamental purpose of the [WRA] is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages.'" *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159, 961 P.2d 371 (1998) (quoting *State v. Carter*, 18 Wn.2d 590, 621, 140 P.2d 298, 142 P.2d 403 (1943)). "The [WRA] is thus primarily a protective measure, rather than a strictly corrupt practices statute." *Carter*, 18 Wn.2d at 621. Accordingly, this court must "liberally construe[] [the WRA] to advance the Legislature's intent to protect employee wages and assure payment." *Schilling*, 136 Wn.2d at 159.

I. The Bonuses Were Wages

We hold that bonuses, once paid for work performed, are wages. The WRA does not define "wage." To give undefined terms meaning, this court may look to dictionary definitions and related statutes. *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976) (dictionary); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10, 43 P.3d 4 (2002) (related statutes). "Ultimately, in resolving a question of statutory construction, this court will adopt the interpretation which best

advances the legislative purpose." *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990).

While the WRA does not define "wage," another related wage statute, the Minimum Wage Act, chapter 49.46 RCW, broadly defines "wage" as "compensation due to an employee by reason of employment." RCW 49.46.010(7). Similarly, *Webster's* defines "wage" as "a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services usu. according to contract and on an hourly, daily, or piecework basis and *often including bonuses*, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2568 (2002) (emphasis added).

Washington courts have previously addressed whether bonuses are wages in only two narrow circumstances: (1) where a bonus is paid, but not for work performed, and (2) where guaranteed payment of a future bonus is implied in a contract. *See, e.g.*, *Byrne v. Courtesy Ford, Inc.*, 108 Wn. App. 683, 692, 32 P.3d 307 (2001) (holding that television unexpectedly won in raffle by company and given to employee was not a wage because there was not sufficient testimony that television was given as compensation for work); *Simon v. Riblet Tramway Co.*, 8 Wn. App. 289, 292-93, 505 P.2d 1291 (1973) (holding that paying employee a bonus regularly for 10 years establishes an implied agreement to pay the bonus as part of employee's earned compensation); *Powell v. Republic Creosoting Co.*, 172 Wash. 155, 159, 19 P.2d 919 (1933) (holding that a substantial bonus paid for 11 consecutive years is sufficient to hold that future bonus money was necessarily due as compensation). However, no

Washington case discusses the character of bonuses already paid for work performed.

LaCoursiere's bonuses are, in important respects, analogous to the promised bonus in *Flower v. T.R.A. Industries, Inc.*, 127 Wn. App. 13, 35, 111 P.3d 1192 (2005). Flower entered into an employment agreement that granted him moving expenses and a $10,000 signing bonus. *Id.* at 23. After moving and two months of work, the employer fired Flower and refused to pay the signing bonus. *Id.* at 24. Among other claims, Flower filed suit for the $10,000 signing bonus, arguing that it was due to him as a wage. After looking at the employment agreement, the court held that the signing bonus was due under the terms of the agreement and not subject to repayment of any sort. Noting that wages are "moneys due '"by reason of employment,"'" the court held further that "[t]here [was] no doubt that the bonus was to be paid 'by reason of employment.'" *Id.* at 34-35 (quoting *Hayes v. Trulock*, 51 Wn. App. 795, 806, 755 P.2d 830 (1988) (quoting RCW 49.46.010(2))).

The bonuses in *Flower* and in this case were not purely gratuitous. The bonus in *Flower* was paid in exchange for the employment; LaCoursiere's bonuses were paid for his work performance. Both bonuses were due by reason of employment. While CamWest maintained the discretion to give the bonus in the first place, once CamWest paid LaCoursiere the bonus based on his work performance, that bonus became a wage that LaCoursiere was "entitled to receive from his employer, and which the employer is obligated to pay." *Carter*, 18 Wn.2d at 621. The only difference is that the bonus in *Flower* was not yet paid and LaCoursiere's bonuses were already paid.

But this difference only makes it more certain that LaCoursiere's bonuses were wages—they were most certainly earned for work performed.

Therefore, we hold that LaCoursiere's bonuses were wages because the bonuses were already paid for work performed. This interpretation gives effect to the legislature's intent to protect money due to employees and comports with the broad definition of "wage."

## II. There Was No Rebate

LaCoursiere's wages were not rebated under the profit sharing plan. The WRA and related acts do not define "rebate." But from the context of the statute and other provisions in the WRA, we conclude that a rebate occurs when an employee receives less than his or her expected wages because a portion of those wages have returned to the employer or its agent. Here, it was not CamWest but the LLC that collected and received the bonus money. Because the LLC was not LaCoursiere's employer, there was no rebate.

According to the plain language of the statute, a "rebate" occurs when an employer or its agent collects or receives a portion of an employee's wage after the wage has been paid. RCW 49.52.050(1) prohibits "[a]ny employer or officer, vice principal or agent of any employer" from collecting or receiving rebates "theretofore paid by such employer to such employee." *Webster's* defines "rebate" as "a retroactive abatement, credit, discount, or refund." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1892 (2002); *see also* BLACK'S LAW DICTIONARY 1458 (10th ed. 2014) (defining "rebate" as a "return of part of a payment, serving as a discount or reduction"); *Jumamil v. Lakeside Casino, LLC*, 179 Wn. App. 665, 687-88, 319 P.3d

9

868 (2014) (explaining that a rebate is a return of employee's wages (citing *Carter*, 18 Wn.2d at 621)). A later provision governs rebates of wages on public works and provides that a public officer who "takes or receives . . . any part or portion of wages paid to any laborer, worker, or mechanic" is guilty of a gross misdemeanor. RCW 49.52.090.

We further explained in *Carter* that a rebate need not be rebated or returned to the hand that actually paid out the wages. 18 Wn.2d at 622. However, to state a claim under RCW 49.52.050, an employee must show that the party unlawfully receiving or collecting rebated wages "was *both* an agent and had control over the payment of wages." *Rekhter v. Dep't of Social & Health Servs.*, 180 Wn.2d 102, 123, 323 P.3d 1036 (2014) (discussing *Ellerman*, 143 Wn.2d at 522).[2] In other words, wages are rebated only when they are returned to an entity that controlled and originated payment. *See Savage-Scofield Co. v. City of Tacoma*, 56 Wash. 457, 460, 105 P. 1032 (1909) ("[a]ccepting the common use of the word 'rebate'—'to draw back,' one cannot draw back something which he never put forward").

---

[2] The concurrence/dissent challenges our reliance on *Rekhter*, reasoning that *Rekhter* analyzed a claim for wrongful withholding of wages, not rebating of wages. Concurrence/dissent at 2-3. But *Rekhter* did not draw the distinction that the concurrence/dissent now urges. Although *Rekhter* involved wrongful withholding of wages as opposed to rebating of wages, its holding plainly extends to all claims arising under RCW 49.52.050. *See Rekhter*, 180 Wn.2d at 123 (explaining what plaintiff must show "in order to prevail on a wage claim" under RCW 49.52.050). The concurrence/dissent also overlooks that both withholding and rebate claims are codified in subsections of the same statute, which applies to "[a]ny employer or officer, vice principal or agent of any employer." RCW 49.52.050(1) (prohibiting "a rebate of any part of wages"), .050(2) (making it unlawful to "pay any employee a lower wage than the wage such employer is obligated to pay such employee"). Furthermore, both rebating wages and wrongful withholding of wages give rise to civil liability for double damages under RCW 49.52.070.

Here, the contributions were not a "rebate" because LaCoursiere's investment was made in the LLC and not in LaCoursiere's employer, CamWest. Under the employment agreement, LaCoursiere agreed to contribute part of his bonus money to the LLC.[3] The LLC did not employ LaCoursiere, nor did it pay LaCoursiere any wages. The LLC was not an agent or principal of CamWest and did not act on behalf of CamWest. All the LLC property was owned by the LLC entity and not by CamWest or any other individual member.[4] Thus, the contributions do not constitute a return of wages to the employer, CamWest.

It is true that the LLC used the bonus contributions to make loans to CamWest. However, this does not, in and of itself, transform the contributions into a rebate. The most accurate characterization of the business structure at issue here is that CamWest and the LLC were separate legal entities engaged in mutually beneficial transactions. Notably, loans from the LLC to CamWest were authorized only if they contained "terms and conditions not more favorable than CamWest could at the time of each obtain from institutional lenders, including the applicable interest rates,

---

[3] The Court of Appeals also concluded that the LaCoursiere "knowingly submitted" to the rebate, and cited this conclusion as an alternative basis for affirming the trial court's grant of summary judgment. *See LaCoursiere*, 172 Wn. App. at 152-53. *See also Carter*, 18 Wn.2d at 623 ("If the contribution be in fact a voluntary donation, it does not necessarily constitute a rebate of wages merely because it moves to, or for the benefit of, the employer."). We note that the mere fact that an employee signed an agreement is likely insufficient to prove voluntariness. *Cf. id.* at 624 (voluntary because employees suggested one-time gift to employer). However, given our conclusion that the wages were not rebated to the employer or the employer's agent, we need not reach—as the concurrence/dissent does—the Court of Appeals' alternative "voluntariness" holding.

[4] It is not clear whether CamWest was ever a member of the LLC, but it is possible because CamWest had an option to purchase units in the event of a sale.

repayment terms and security of performance."[5] Thus, we hold that the contributions LaCoursiere made to the LLC were not a rebate.

A rebate occurs when a portion of an employee's wages returns to the employer or an agent of the employer. Here, LaCoursiere's membership in the LLC was subject to a vesting schedule. Nothing was "rebated" when LaCoursiere forfeited the *unvested* portion (40 percent) of his investment at his termination. LaCoursiere might have received the full value of his investment had he stayed with the company for five years. LaCoursiere received only 60 percent of his investment in the LLC because his persistent tardiness to work resulted in his termination before he could fully vest. Under the LLC agreement, his units were then sold according to certain rules—rules that make it impossible to predict where the units would end up at the time wages are paid. The unvested portion may be purchased by CamWest, but it may also be purchased by Campbell or the other LLC members. This uncertainty makes it impossible to label the forfeiture of the unvested portion of LaCoursiere's investment a "rebate."

Indeed, the profit sharing plan presented in this case is not the type of "rebate" that anti-kickback statutes are designed to address. Other jurisdictions have held that, under similar wage statutes, an employer may retain the unvested portion of an employee's wages voluntarily invested into the employer-company. *See, e.g., Rosen*

---

[5] This explicit contractual restriction refutes the concurrence/dissent's assertion that "almost nothing in the record" supports the conclusion that CamWest and the LLC are different entitles. Concurrence/dissent at 3. The record also includes the LLC agreement. Clerk's Papers (CP) at 169-208. Moreover, Campbell's declaration states unequivocally that "[t]he LLC is a separate entity from CamWest," CP at 159, and LaCoursiere never presented evidence to dispute this assertion. The overlapping ownership of the two entities does not erase the fact that they are legally separate.

*v. Smith Barney, Inc.*, 393 N.J. Super. 578, 585-94, 925 A.2d 32 (2007), *aff'd*, 195 N.J. 423, 950 A.2d 205 (2008) (holding that a vesting provision of a stock plan was allowable under a similar wage law because the employee knew both the potential risks of forfeiture and benefits of participation before voluntarily agreeing to the plan); *see also Kim v. Citigroup, Inc.*, 368 Ill. App. 3d 298, 309, 856 N.E.2d 639, 305 Ill. Dec. 834 (2006) (holding that a similar wage statute is not violated when an employee voluntarily invests wages in a stock plan with a vesting period and voluntarily forfeits the unvested portion of the stock). Thus, we hold that while the bonuses in these circumstances were wages, there was no rebate of those wages and no violation of the WRA. We need not reach the question of whether LaCoursiere knowingly submitted to any violation.

III.    Attorney Fees

"Whether a contract or statute authorizes an award of attorney fees is a question of law reviewed de novo." *McGuire v. Bates*, 169 Wn.2d 185, 189, 234 P.3d 205 (2010). We hold that CamWest is not entitled to attorney fees because under the WRA, attorney fees may be awarded only to prevailing employees, not employers.

The Court of Appeals based the award of attorney fees to CamWest upon LaCoursiere's employment agreement. *LaCoursiere*, 172 Wn. App. at 154. The employment agreement reads in part:

> If either party brings an action arising under this Agreement, the prevailing party shall be entitled to recover its reasonable costs and attorney fees incurred in connection therewith, whether at arbitration, trial or any appeal therefrom.

Generally, we enforce attorney fee provisions in contracts "if the action arose out of the contract and if the contract is central to the dispute." *Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n*, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991). However, LaCoursiere's claim is grounded exclusively in the WRA. He makes no claims on the employment agreement. Therefore, this suit arises out of the WRA, and we apply the attorney fee provision in the WRA.

The WRA allows only prevailing employees to collect attorney fees:

> Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by the aggrieved employee or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees.

RCW 49.52.070; *see also Walters v. A.A.A. Waterproofing, Inc.*, 151 Wn. App. 316, 321-22, 211 P.3d 454 (2009). We have previously held that mandatory attorney fee shifting provisions in employment contracts are unconscionable where the legislature authorizes only prevailing employees to collect attorney fees. *See Brown v. MHN Gov't Servs., Inc.*, 178 Wn.2d 258, 274-75, 306 P.3d 948 (2013) (holding that a mandatory fee shifting provision in an employment agreement is unconscionable under a similar statute because it was "a significant deterrent to employees contemplating initiating an action to vindicate their rights"); *see also Walters*, 151 Wn. App. at 325 (holding that in the context of the WRA, "a reciprocal attorney fees provision is unconscionable"). Therefore, we reverse the Court of Appeals and deny CamWest attorney fees. The mandatory attorney fees provision in the employment

agreement does not apply when an employee makes claims exclusively under the WRA.

## CONCLUSION

We affirm the Court of Appeals' dismissal of LaCoursiere's WRA claim against CamWest. But on the issue of attorney fees, we reverse the Court of Appeals and reinstate the trial court's order denying CamWest's motion for attorney fees.

No. 88298-3

_Wiggins, J._

WE CONCUR.

_Madsen, C.J._

_Owens, J._

_Fairhurst, J._

_Gordon McCloud, J._

16

No. 88298-3

GONZÁLEZ, J. (concurring in part and dissenting in part)—I concur with much in the majority opinion. I agree that bonuses, once paid, are wages for purposes of chapter 49.52 RCW. I also agree that prevailing employers are not entitled to attorney fees under the act. It would frustrate the broad remedial purpose of the act to allow an employer to override the clear statutory system by contract. I write separately, however, for two reasons.

First, I disagree with the Court of Appeals' conclusion that as a matter of law, LaCoursiere "'knowingly submitted'" to any violation and thus may not take advantage of the private suit provision of the act. *LaCoursiere v. CamWest Dev., Inc.*, 172 Wn. App. 142, 152, 289 P.3d 683 (2012) ("'[T]he benefits of this [private suit] section shall not be available to any employee who has knowingly submitted to such violations.'" (quoting RCW 49.52.070)). The only evidence that LaCousiere "knowingly submitted" to any violation is the employment and LLC agreements that detailed the mechanics of the bonus system. Nothing in these contracts would suggest to the reasonable reader that the worker was waiving the statutory productions of Title 49 RCW. "Courts will not 'infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly

stated. More succinctly, the waiver must be clear and unmistakable.'" *Pasco Police Officers' Ass'n v. City of Pasco*, 132 Wn.2d 450, 462, 938 P.2d 827 (1997) (internal quotation marks omitted) (quoting *Metro. Edison Co. v. Nat'l Labor Relations Bd.*, 460 U.S. 693, 708, 103 S. Ct. 1467, 75 L. Ed. 2d 387 (1983)). It would undermine the remedial purposes of the act to let employers evade it with contractual language that never mentions it. It may be that LaCoursiere did knowingly submit to a violation of the act, but taken in the light most favorable to LaCoursiere, as we must at this stage, CamWest is not entitled to summary judgment on this issue.

Second, I disagree with the majority that CamWest is entitled to summary judgment dismissal on the rebate claim. Initially, I observe that the majority's citation to our recent opinion, *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 123, 323 P.3d 1036 (2014), is not well taken. Majority at 10. *Rekhter* was not a wage rebate claim; it was a claim for unlawfully *withheld* wages. Chapter 49.52 RCW governs more than wage rebates; we call it the "wage rebate act" from time to time (as well as the "anti-kickback act") by tradition and not as a summary of the act's contents. *See, e.g., Champagne v. Thurston County*, 163 Wn.2d 69, 72, 178 P.3d 936 (2008). *Rekhter* involved a claim brought under chapter 49.52 RCW for wrongfully *withheld* wages. *Rekhter*, 180 Wn.2d at 109 (citing RCW 49.52.050, .070). *Rekhter*, like most of our chapter 49.52 RCW cases over its long history, never describes the act as the "wage rebate act." *See, e.g., Morgan v. Kingen*, 166 Wn.2d 526, 210 P.3d

995 (2009); *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 961 P.2d 371 (1998);

*State v. Carter*, 18 Wn.2d 590, 140 P.2d 298, 142 P.2d 403 (1943).

In *Rekhter*, we held that "in order to prevail on a wage claim, the employee must show that the party withholding the wages was both an agent and had control over the payment of wages." *Rekhter*, 180 Wn.2d at 123 (citing *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 522-23, 22 P.3d 795 (2001)). We had no occasion to consider whether the same principle applied to wage *rebate* claims because no unlawful rebate claims were presented. Nor should we reach that theory without proper briefing from meaningfully adverse parties.

Next, I disagree with the majority that we can tell from this record whether "CamWest and the LLC were separate legal entities engaged in mutually beneficial transactions." Majority at 11. The majority directs us to almost nothing in the record that supports that characterization, and facts alleged in LaCoursiere's complaint and in declarations attached to CamWest's summary judgment motion certainly suggest that characterization is inapt. The president of CamWest was also the manager of the LLC. Clerk's Papers (CP) at 5, 159-60. Membership in the LLC is limited to management employees of CamWest, who on separation from CamWest must sell their shares back to the LLC, CamWest, or the remaining members. *Id.* at 160. The president of CamWest personally guaranteed the loans made by the LLC to CamWest. *Id.* at 5. The amount of the employee's bonus paid into the LLC is decided by the man who is both the president of CamWest and the manager of the LLC. *Id.* at 160.

3

It may well be that, as the majority says, "CamWest and the LLC were separate legal entities engaged in mutually beneficial transactions," majority at 11, but the record creates at least a material question of fact as to whether that is so.[1]

The harder question in this case is whether the structured buyout of a terminated employee's interest in the allied LLC was a rebate under the act. Certainly, if LaCoursiere received more than he had paid in, no cognizable claim that wages had been rebated could be maintained. It may well be that this is one of those situations where investments were made and investments failed. This was not uncommon in the construction industry starting in 2008. But the fact is the worker's wages were paid into a fund controlled by the corporation and, when the worker was terminated, not returned in full.

In my view, LaCoursiere has pleaded a cognizable claim that CamWest unlawfully "rebated" a portion of his wages when it declined to reimburse him for all of the bonus money paid into the LLC. While I would not grant him summary

---

[1] Additionally, I am troubled by the majority's statement that under the LLC agreement, "it [is] impossible to predict where [LaCoursiere's LLC membership] units would end up. . . . The unvested portion may be purchased by CamWest, but it may also be purchased by Campbell or the other LLC members. This uncertainty makes it impossible to label the forfeiture of the unvested portion of LaCoursiere's investment a 'rebate.'" Majority at 12. Whatever uncertainty there is does not support granting summary judgment to the employer. CamWest's declaration states that his units were purchased under the LLC agreement. CP at 165. Under the LLC Agreement, units can be purchased only by Eric Campbell (who has the first right to purchase), by CamWest (which has the second), and only then by the other members of the LLC. *Id.* at 194. The LLC also provides that "[i]f all of the selling Member's Units are not so purchased, the Company shall be dissolved." *Id.*

judgment on this record, neither would I grant summary judgment to CamWest.

Instead, I would remand for trial.

I respectfully concur in part and dissent in part.

González, J.

Stephens, J.

Johnson

J. M. Johnson, J. P.T.